**Exhibit B**

**Security Agreement**

# FIRST LIEN SECURITY AGREEMENT

This FIRST LIEN SECURITY AGREEMENT (this "Agreement") is made as of this 13th day of February, 2019, among the Grantors listed on the signature pages hereof (such Grantors, the "Initial Grantors"), those additional entities that hereafter become parties hereto as Grantors by executing the form of supplement attached hereto as Annex 1 (collectively with the Initial Grantors, jointly and severally, the "Grantors" and each individually, a "Grantor"), and Cortland Capital Market Services LLC, in its capacity as collateral agent (in such capacity, and together with its successors and assigns, the "Collateral Agent") on behalf of the Secured Parties (as defined in the Credit Agreement referred to below).

W I T N E S S E T H:

WHEREAS, pursuant to that certain First Lien Credit Agreement, dated as of the date hereof (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), by and among Aztec / Shaffer, LLC, a Texas limited liability company (the "Borrower"), the other Persons party thereto from time to time as Guarantors, the financial institutions party thereto from time to time as Lenders, Cortland Capital Market Services LLC, as the Term Loan Agent and Collateral Agent, and Texas Capital Bank, National Association, as the Revolving Agent, the Lenders are willing to make certain financial accommodations available to the Borrower from time to time pursuant to the terms and conditions thereof; and

WHEREAS, in order to induce the Lenders to enter into the Credit Agreement and the other Loan Documents and to induce the Lenders to make financial accommodations to the Borrower as provided for in the Credit Agreement, the Grantors have agreed to grant a continuing security interest in and to the Collateral in order to secure the prompt and complete payment, observance and performance of, among other things, (a) all of the present and future obligations of the Grantors arising from this Agreement, the Credit Agreement and the other Loan Documents and (b) all other Obligations, including, in the case of each of clauses (a) and (b), any fees and expenses of counsel to the Secured Parties, or any member thereof, that are required to be paid by the Borrower or any Guarantor pursuant to the terms of any Loan Document and any interest, fees or expenses that accrue in respect of such obligations or other Obligations, as the case may be, after the filing of an Insolvency Proceeding, regardless of whether allowed or allowable in whole or in part as a claim in any Insolvency Proceeding (clauses (a) and (b) being hereinafter referred to as the "Secured Obligations");

NOW, THEREFORE, for and in consideration of the recitals made above, the financial accommodations provided under the Credit Agreement which directly or indirectly benefit the Grantors, and other good and valuable consideration, the receipt, sufficiency and adequacy of which are hereby acknowledged, the parties hereto agree as follows:

1.      Defined Terms.  All capitalized terms used herein (including in the preamble and recitals hereof) without definition herein shall have the meanings ascribed thereto in the Credit Agreement.  Any terms used in this Agreement that are defined in the UCC shall be construed and defined as set forth in the UCC unless otherwise defined herein or in the Credit Agreement; provided, however, that, to the extent that the UCC is used to define any term herein and such term

is defined differently in different Articles of the UCC, the definition of such term contained in Article 9 of the UCC shall govern.  In addition to those terms defined elsewhere in this Agreement, as used in this Agreement, the following terms shall have the following meanings:

(a)     "Accounts" shall mean accounts (as that term is defined in the UCC), whether now existing or hereafter created or arising, and, in any event, includes, without limitation, (a) all of each Grantor's accounts receivable, other receivables, book debts and other forms of obligations (including any such obligations that may be characterized as an account or contract right under the UCC) arising from such transactions, (b) all of each Grantor's rights in, to and under all purchase orders or receipts for goods or services, (c) all of each Grantor's rights to any goods represented by any of the foregoing (including unpaid sellers' rights of rescission, replevin, reclamation and stoppage in transit and rights to returned, reclaimed or repossessed goods), (d) all rights to payment due to a Grantor for property sold, leased, licensed, assigned or otherwise disposed of, for a policy of insurance issued or to be issued, for a secondary obligation incurred or to be incurred, for energy provided or to be provided, for the use or hire of a vessel under a charter or other contract, arising out of the use of a credit card or charge card, or for services rendered or to be rendered by such Grantor or in connection with any other transaction (whether or not yet earned by performance on the part of such Grantor), (e) all health care insurance receivables and (f) all collateral security of any kind, given by any Account Debtor or any other Person with respect to any of the foregoing.

(b)     "Books" means books and records (including each Grantor's Records indicating, summarizing, or evidencing or related to such Grantor's assets (including the Collateral) or liabilities, each Grantor's Records relating to such Grantor's business operations or financial condition, and each Grantor's Goods or General Intangibles related to such information).

(c)     "Chattel Paper" means chattel paper (as that term is defined in the UCC) and includes tangible chattel paper and electronic chattel paper (as each such term is defined in the UCC).

(d)     "Collateral" has the meaning specified in Section 2.

(e)     "Collateral Agent" has the meaning specified in the preamble to this Agreement.

(f)     "Collateral Support" means all property (real or personal) assigned, pledged or hypothecated to a Grantor or otherwise securing any Collateral for the benefit of a Grantor and shall include all rights of such Grantor under any security agreement or other agreement granting a Lien or security interest in such real or personal property in favor of such Grantor.

(g)     "Commercial Tort Claims" means commercial tort claims (as that term is defined in the UCC), and includes those commercial tort claims listed on Schedule 2 (as may be supplemented from time to time pursuant to Section 6(e)).

(h)     "Copyrights" means any and all copyrights and copyright registrations, including the copyright registrations and recordings thereof and all applications in connection therewith listed on Schedule 3, and (i) all reissues, continuations, extensions or renewals thereof,

2

(ii) all income, royalties, damages and payment under all licenses entered into in connection therewith and damages and payments for past or future infringements or other violations thereof, (iii) the right to sue for past, present and future infringements or other violations thereof, and (iv) all of each Grantor's rights corresponding to the foregoing throughout the world.

(i)      "<u>Copyright Security Agreement</u>" means each First Lien Copyright Security Agreement among one or more Grantors and the Collateral Agent in substantially the form of <u>Exhibit A</u> attached hereto, pursuant to which such Grantors have granted to the Collateral Agent a security interest in all their respective Copyrights in the United States of America.

(j)      "<u>Credit Agreement</u>" has the meaning specified in the recitals to this Agreement.

(k)      "<u>Determination Date</u>" means, with respect to any Grantor, the most recent to occur of (a) the Agreement Date (or, with respect any Grantor that is not an Initial Grantor, the date on which such Grantor becomes a party hereto) and (b) the most recent date on which the Borrower is required to deliver to each member of the Lender Group a Compliance Certificate pursuant to Section 7.3 of the Credit Agreement, accompanied by updated Schedules to this Agreement pursuant to <u>Section 6(l)</u> hereof.

(l)      "<u>Excluded Collateral</u>" means any of the following:

(i)      equity interests (A) in any Subsidiary that is not a wholly owned Subsidiary to the extent prohibited by the terms of such person's organizational or joint venture documents existing as of the Agreement Date (or immediately prior to the applicable Borrower Party's acquisition of an interest in such subsidiary if such prohibition was not created in contemplation of such entity becoming a Subsidiary of a Borrower Party) and (B) in any Person that is not a Subsidiary to the extent not permitted by the terms of such Person's organizational or joint venture documents;

(ii)      motor vehicles and other assets subject to certificates of title (other than to the extent perfection of the security interest in such assets is accomplished solely by the filing of a UCC financing statement);

(iii)      any Commodity Accounts, Deposit Accounts, or Securities Accounts described in clauses (a) through (c) of definition of "Excluded Accounts";

(iv)      any intent-to-use United States trademark application for which an amendment to allege use or statement of use has not been filed or, if filed, has not been deemed in conformance with 15 U.S.C. §1051(a) or examined and accepted by the United States Patent and Trademark Office (provided that each such intent-to-use application shall be considered Collateral immediately and automatically upon such acceptance);

(v)      any contract, lease, license, permit or other General Intangible, any rights, priorities or privileges granted under such contracts, leases, licenses, permits or General Intangibles or any property subject to a purchase money security interest or similar arrangement which by its terms cannot be pledged or transferred by such Grantor, or to the

3

extent that granting a security interest therein would violate, invalidate or result in a breach or default under such contract, lease, license, permit, General Intangible or purchase money arrangement or create a right of acceleration, modification, termination or cancellation in favor of any other party thereto (other than any Grantor) (in each case after giving effect to Sections 9-406(d), 9-407(a), 9-408(a) or 9-409 of the UCC (or any successor provision or provisions) or any other Applicable Law);

(vi)      any assets owned on or acquired after the Agreement Date, to the extent that, and for so long as, the granting of a security interest in such assets would violate or is prohibited by Applicable Law or requires a consent not obtained of any Governmental Authority pursuant to such Applicable Law (in each case after giving effect to Sections 9-406(d), 9-407(a), 9-408(a) or 9-409 of the UCC (or any successor provision or provisions) or any other Applicable Law); and

(vii)      any assets as to which the Collateral Agent and the Borrower shall determine that the costs and burdens of obtaining a security interest therein outweigh the benefit to the Lenders of the security afforded thereby;

provided, however, that "Excluded Collateral" shall (A) not include any right to receive proceeds from the sale or other disposition of Excluded Collateral or any proceeds, substitutions or replacements of Excluded Collateral (unless such proceeds, substitutions or replacements would constitute Excluded Collateral) and (B) with respect to the exclusions set forth in clause (v) above, not be construed to limit, impair or otherwise affect the Collateral Agent's continuing security interests in the Borrower's or any Grantor's rights to or interests of the Borrower or any Grantor in (x) monies due or to become due under any such contract, lease, license, permit or other General Intangible (to the extent not prohibited by such contract, lease, license, permit or other General Intangible and Applicable Law), or (y) any proceeds from the sale, license, lease or other disposition of any such contract, lease, license, permit or other General Intangible.

(m)      "General Intangibles" means general intangibles (as that term is defined in the UCC), including, without limitation, payment intangibles, contract rights, rights to payment, rights arising under common law, statutes, or regulations, choses or things in action, goodwill (including the goodwill associated with any Trademark, Patent or Copyright), Patents, Trademarks, Copyrights, domain names and other Intellectual Property or rights therein or applications therefor, whether under license or otherwise, purchase orders, monies due or recoverable from pension funds, rights to payment and other rights under any royalty or licensing agreements, including Intellectual Property Licenses, infringement claims, pension plan refunds, pension plan refund claims, insurance premium rebates, tax refunds, and tax refund claims, uncertificated Equity Interests not constituting a security (as defined in the UCC), and any other personal property other than Commercial Tort Claims, money, Accounts, Chattel Paper, Commodity Accounts, Deposit Accounts, Securities Accounts, Goods, Investment Related Property, Negotiable Collateral, and oil, gas, or other minerals before extraction.

(n)      "Grantor" and "Grantors" each have the meaning specified in the preamble to this Agreement.

(o)     "Insurance Policies" shall mean (i) all insurance policies covering any or all of the Collateral (regardless of whether the Collateral Agent is the loss payee or lender loss payee thereof) and (ii) any key man life insurance policies.

(p)     "Intellectual Property" means any and all Intellectual Property Licenses, Patents, Copyrights, Trademarks, domain names and trade secrets.

(q)     "Intellectual Property Licenses" means any written grant of rights under or interest in any Patent, Trademark, Copyright or other Intellectual Property that is material to the business of any Grantor, including software license agreements with any other party, whether the applicable Grantor is a licensee or licensor under any such license agreement, including the license agreements listed on Schedule 4, but excluding (i) off-the-shelf software licenses that are commercially available to the public generally or (ii) any non-exclusive licenses that are granted as an ancillary and non-material part of services, supply or manufacturing arrangements or other collaborations with a third party in the ordinary course of business.

(r)     "Inventory" shall mean inventory (as that term is defined in the UCC), whether now existing or hereafter acquired, wherever located, and, in any event, including, without limitation, inventory, merchandise, goods and other personal property that are held by or on behalf of a Grantor for sale or lease or are furnished or are to be furnished under a contract of service, goods that are leased by a Grantor as lessor, or that constitute raw materials, samples, work-in-process, finished goods, returned goods, promotional materials or materials or supplies of any kind, nature or description used or consumed or to be used or consumed in a Grantor's business or in the processing, production, packaging, promotion, delivery or shipping of the same, including all supplies and embedded software.

(s)     "Investment Related Property" means (i) investment property (as that term is defined in the UCC), (ii) all Pledged Equity, Pledged Operating Agreements and Pledged Partnership Agreements (regardless of whether classified as investment property under the UCC) and (iii) without limiting the foregoing, all other Equity Interests owned by any Grantor.

(t)     "Negotiable Collateral" means letters of credit, Instruments and letter of credit rights, promissory notes, drafts and documents (as each such term is defined in the UCC).

(u)     "Patents" means any and all patents and patent applications, including the patents and patent applications listed on Schedule 5, and (i) all renewals thereof, (ii) all income, royalties, damages and payments now and hereafter due or payable under an with respect thereto, including payments under all licenses entered into in connection therewith and damages and payments for past or future infringements or other violations thereof, (iii) the right to sue for past, present and future infringements thereof, and (iv) all of each Grantor's rights corresponding to the foregoing throughout the world.

(v)     "Patent Security Agreement" means each First Lien Patent Security Agreement among one or more Grantors and the Collateral Agent in substantially the form of Exhibit B attached hereto, pursuant to which such Grantors have granted to the Collateral Agent a security interest in all their respective Patents in the United States of America.

5

(w)     "<u>Pledged Companies</u>" means each Person listed on <u>Schedule 6</u> as a "Pledged Company", together with each other Person all or a portion of whose Equity Interests is acquired or otherwise directly owned by a Grantor after the Agreement Date, provided that no Excluded Collateral shall be considered part of the Pledged Companies.

(x)     "<u>Pledged Equity</u>" means all of each Grantor's right, title and interest in and to all of the Equity Interests now or hereafter directly owned by such Grantor, regardless of class or designation, in each of the Pledged Companies, and all substitutions therefor and replacements thereof, all proceeds thereof and all rights relating thereto, including any certificates representing the Equity Interests, the right to request after the occurrence and during the continuation of an Event of Default that such Equity Interests be registered in the name of the Collateral Agent or any of its nominees, the right to receive any certificates representing any of such Equity Interests and the right to require that such certificates be delivered to the Collateral Agent together with undated powers or assignments of investment securities with respect thereto, duly endorsed in blank by such Grantor, all warrants, options, share appreciation rights and other rights, contractual or otherwise, in respect thereof and of all dividends, distributions of income, profits, surplus, or other compensation by way of income or liquidating distributions, in cash or in kind, and cash, instruments, and other property from time to time received, receivable, or otherwise distributed in respect of or in addition to, in substitution of, on account of, or in exchange for any or all of the foregoing, provided that no Excluded Collateral shall be considered part of the Pledged Equity.

(y)     "<u>Pledged Equity Addendum</u>" means a Pledged Equity Addendum substantially in the form of <u>Exhibit C</u> to this Agreement.

(z)     "<u>Pledged Operating Agreements</u>" means all of each Grantor's rights, powers, and remedies under the limited liability company operating agreements of each of the Pledged Companies that are limited liability companies.

(aa)     "<u>Pledged Partnership Agreements</u>" means all of each Grantor's rights, powers, and remedies under the partnership agreements of each of the Pledged Companies that are partnerships.

(bb)     "<u>Proceeds</u>" has the meaning specified in <u>Section 2</u>.

(cc)     "<u>Real Property</u>" means any estates or interests in real property now owned or hereafter acquired by any Grantor and the improvements thereto.

(dd)     "<u>Receivables</u>" means the Accounts, Chattel Paper, Documents, Investment Property, Instruments and any other rights or claims to receive money which are General Intangibles or which are otherwise included as Collateral.

(ee)     "<u>Records</u>" means information that is inscribed on a tangible medium or which is stored in an electronic or other medium and is retrievable in perceivable form.

(ff)     "<u>Secured Obligations</u>" has the meaning specified in the recitals to this Agreement.

6

(gg)     "Security Interest" has the meaning specified in Section 2.

(hh)     "Supporting Obligations" means supporting obligations (as such term is defined in the UCC), and includes letters of credit and guarantees issued in support of Accounts, Chattel Paper, documents, General Intangibles, Instruments or Investment Related Property.

(ii)     "Trademarks" means any and all trademarks, trade names, registered trademarks, trademark applications, service marks, registered service marks and service mark applications, including the registered trademarks, trademark applications, registered service marks and service mark applications listed on Schedule 7, and (i) all renewals thereof, (ii) all income, royalties, damages and payments now and hereafter due or payable under and with respect thereto, including payments under all licenses entered into in connection therewith and damages and payments for past or future infringements, dilutions or other violations thereof, (iii) the right to sue for past, present and future infringements, dilution or other violations thereof, (iv) the goodwill of each Grantor's business symbolized by the foregoing and connected therewith and (v) all of each Grantor's rights corresponding to the foregoing throughout the world.

(jj)     "Trademark Security Agreement" means each First Lien Trademark Security Agreement among one or more Grantors and the Collateral Agent in substantially the form of Exhibit D attached hereto, pursuant to which such Grantors have granted to the Collateral Agent a security interest in all their respective Trademarks in the United States of America.

2.     Grant of Security.

(a)     Each Grantor hereby unconditionally grants, collaterally assigns, mortgages, pledges and hypothecates to the Collateral Agent, for the benefit of the Secured Parties, a continuing security interest in and Lien on (hereinafter referred to as the "Security Interest") all of such Grantor's right, title and interest in and to the following property, whether now owned or hereafter acquired or arising and wherever located (the "Collateral"):

(i)     all of such Grantor's Accounts and other Receivables;

(ii)     all of such Grantor's Books;

(iii)     all of such Grantor's Chattel Paper;

(iv)     all of such Grantor's interest with respect to any Commodity Account, Deposit Account and Securities Account;

(v)     all of such Grantor's Equipment and Fixtures;

(vi)     all of such Grantor's General Intangibles;

(vii)     all of such Grantor's Insurance Policies;

(viii)     all of such Grantor's Inventory;

(ix)     all of such Grantor's Investment Related Property;

7

(x)     all of such Grantor's Negotiable Collateral;

(xi)     all of such Grantor's Intellectual Property;

(xii)     all of such Grantor's rights in respect of all Collateral Support and all Supporting Obligations;

(xiii)     all of such Grantor's interest with respect to Commercial Tort Claims;

(xiv)     all of such Grantor's money and Cash Equivalents;

(xv)     all other Goods (including but not limited to Fixtures) and personal property of such Grantor, whether tangible or intangible and wherever located; and

(xvi)     all of the proceeds and products, whether tangible or intangible, of any of the foregoing, including proceeds of Insurance Policies or Commercial Tort Claims covering or relating to any or all of the foregoing, and any and all Accounts, Books, Chattel Paper, Commodity Accounts, Deposit Accounts, Securities Accounts, Equipment, Fixtures, General Intangibles, Inventory, Investment Related Property, Negotiable Collateral, Supporting Obligations, money, or other tangible or intangible property resulting from the sale, lease, license, exchange, collection, or other disposition of any of the foregoing, the proceeds of any award in condemnation with respect to any of the property of Grantors, any rebates or refunds, whether for taxes or otherwise, and all proceeds of any such proceeds, or any portion thereof or interest therein, and the proceeds thereof, and all proceeds of any loss of, damage to, or destruction of the above, whether insured or not insured, and, to the extent not otherwise included, any indemnity, warranty, or guaranty payable by reason of loss or damage to, or otherwise with respect to any of the foregoing Collateral (the "Proceeds"). Without limiting the generality of the foregoing, the term "Proceeds" includes whatever is receivable or received when Investment Related Property or proceeds are sold, exchanged, collected, or otherwise disposed of, whether such disposition is voluntary or involuntary, and includes proceeds of any indemnity or guaranty payable to any Grantor or the Collateral Agent from time to time with respect to any of the Investment Related Property.

(b)     Notwithstanding any of the provisions set forth in this Section 2 to the contrary, nothing in this Agreement shall constitute a grant of a security interest in, and the Collateral shall not include, any Excluded Collateral; provided that, if and when any such item, category or type of property shall cease to be "Excluded Collateral", such property shall be deemed at all times from and after such time to constitute Collateral.

3.     Security for Obligations. This Agreement and the Security Interest created hereby secures the prompt payment and performance of all of the Secured Obligations, whether now existing or arising hereafter. Without limiting the generality of the foregoing, this Agreement secures the payment of all amounts which constitute part of the Secured Obligations and would be owed by Grantors, or any of them, but for the fact that they are unenforceable or not allowable due to the existence of an Insolvency Proceeding involving any Grantor.

8

4.      _Grantors Remain Liable_.  Anything herein to the contrary notwithstanding, (a) each of the Grantors shall remain liable under the contracts and agreements included in the Collateral, including the Pledged Operating Agreements and the Pledged Partnership Agreements, to perform all of the duties and obligations thereunder to the same extent as if this Agreement had not been executed, (b) the exercise by the Collateral Agent of any of the rights hereunder shall not release any Grantor from any of its duties or obligations under such contracts and agreements included in the Collateral, and (c) the Collateral Agent shall not have any obligation or liability under such contracts and agreements included in the Collateral by reason of this Agreement, nor shall the Collateral Agent be obligated to perform any of the obligations or duties of any Grantors thereunder or to take any action to collect or enforce any claim for payment assigned hereunder. It is the intention of the parties hereto that (a) record and beneficial ownership of the Pledged Equity, including all voting, consensual, and dividend rights in respect thereof, shall remain in the applicable Grantor and (b) the applicable Grantor shall remain entitled to receive all dividends, distributions, Proceeds or other sums paid or payable in respect of any Collateral, in the case of each of clauses (a) and (b), until (x) the occurrence of an Event of Default (but only for so long as such Event of Default is continuing) and (y) (i) the Collateral Agent shall exercise its voting, consensual, or dividend rights with respect to the Pledged Equity pursuant to Section 15 or (ii) the Collateral Agent shall enforce the Security Interest in respect of such Investment Related Property pursuant to Section 16.

5.      _Representations and Warranties_.  Each Grantor hereby represents and warrants as follows:

(a)      The exact legal name of each of the Grantors as of the Determination Date is set forth on the signature pages of this Agreement.  As of the Determination Date, no Grantor conducts, and, during the five-year period immediately preceding the Agreement Date, no Grantor has conducted, business under any trade name or other name other than those set forth on Schedule 1.

(b)      As of the Determination Date, such Grantor's organizational identification number (within the meaning of Section 9-516(b)(5)(C)(iii) of the UCC) and its chief executive office, principal place of business and the place where such Grantor maintains its records concerning the Collateral are set forth on Schedule 1.  If such Grantor is a corporation, limited liability company, limited partnership, corporate trust or other registered organization, the state under whose law such registered organization was organized as of the Determination Date is set forth on Schedule 1.

(c)      Schedule 8 sets forth all Real Property owned or leased by Grantors as of the Determination Date.

(d)      Intellectual Property.

(i)      As of the Determination Date, Schedules 3, 4, 5, and 7, respectively set forth all registered Copyrights, exclusive or otherwise material Intellectual Property Licenses, issued Patents and pending Patent applications and registered Trademarks and pending Trademark applications owned by each Grantor or to which Grantor is a party, as applicable.

9

US 6078468v.4

(ii)     To the knowledge of each Grantor, all of such Grantor's registered and pending applications for material Copyrights, Patents and Trademarks are subsisting and have not been adjudged invalid or unenforceable, in whole or in part, nor are any Patents the subject of a reexamination proceeding.  To the knowledge of each Grantor, each Grantor has performed all acts and has paid all renewal, maintenance, and other fees and taxes required to maintain each material registration in full force and effect.  To the knowledge of each Grantor, no claim has been asserted in writing or is pending by any Person challenging the use, validity or effectiveness of any Intellectual Property owned by such Grantor, other than non-final office actions issued in the ordinary course.

(iii)     No Grantor has made a previous assignment, sale, transfer, exclusive license, or similar arrangement constituting a present or future assignment, sale, transfer, exclusive license or similar arrangement of any Intellectual Property included in the Collateral that has not been terminated or released, except for Permitted Liens.

(iv)     Each Grantor has taken commercially reasonable steps to protect the confidentiality of its trade secrets in accordance with industry standards.

(v)     To each Grantor's knowledge, no claim has been made that the use of any material Intellectual Property owned or used by any Grantor (or any of its respective licensees) infringes, misappropriates, dilutes or otherwise violates the asserted rights of any other Person.  To each Grantor's knowledge, no Person is infringing, misappropriating, diluting or otherwise violating any material rights in any material Intellectual Property owned, licensed or used by such Grantor (or any of its licensees).  No settlement or consents, covenants not to sue, co-existence agreements, non-assertion assurances, or releases have been entered into by any Grantor or bind any Grantor in a manner that could adversely affect any Grantor's rights to own, license or use any Intellectual Property material to its business.

(e)     This Agreement creates a valid and continuing perfected security interest in favor of the Collateral Agent for the benefit of the Secured Parties in all Collateral (for the avoidance of doubt, other than any Excluded Collateral) of each of the Grantors, to the extent a security interest therein can be created under the UCC, securing the payment of the Secured Obligations.  Except to the extent a security interest in the Collateral cannot be perfected by the filing of a financing statement under the UCC, all filings and other actions necessary to perfect and protect such security interest have been duly taken or will have been taken upon the filing of financing statements listing each applicable Grantor, as a debtor, and the Collateral Agent, as secured party, in the jurisdictions listed next to such Grantor's name on Schedule 9.  Upon the making of such filing of financing statements and the filing of the Copyright Security Agreement in the United States Copyright Office and the filing of the Patent Security Agreement and the Trademark Security Agreement in the United States Patent and Trademark Office, the Collateral Agent shall have a first priority perfected security interest in the Collateral of each Grantor to the extent such security interest can be perfected by the making of such filings subject only to Permitted Liens.

(f)     Pledged Equity and Investment Related Property.

10

(i)        Except for the Security Interest created hereby, each Grantor is and will at all times be the sole holder of record and the legal and beneficial owner, free and clear of all Liens, except for Permitted Liens, of the Pledged Equity indicated on <u>Schedule 6</u> as being owned by such Grantor and, when acquired by such Grantor, any Pledged Equity acquired after the Agreement Date.

(ii)        All of the Pledged Equity is duly authorized, validly issued, fully paid and nonassessable and the Pledged Equity constitutes or will constitute the percentage of the issued and outstanding Equity Interests of the Pledged Companies of such Grantor identified on <u>Schedule 6</u> as supplemented or modified by any Pledged Equity Addendum or any <u>Annex 1</u> supplement to this Agreement.

(iii)        Such Grantor has the right and requisite authority to pledge the Investment Related Property pledged by such Grantor to the Collateral Agent as provided herein.

(iv)        All actions necessary to perfect, establish the first priority of, or otherwise protect, the Collateral Agent's Security Interest in the Investment Related Property, and the proceeds thereof, will have been duly taken, (A) upon the execution and delivery of this Agreement, (B) upon the taking of possession by the Collateral Agent of any certificates constituting the Pledged Equity, to the extent such Pledged Equity is represented by certificates, together with undated powers endorsed in blank by the applicable Grantor, (C) upon the filing of financing statements in the applicable jurisdiction set forth on <u>Schedule 9</u> for such Grantor with respect to the Pledged Equity of such Grantor that is not represented by certificates, and (D) with respect to any Deposit Accounts or Securities Accounts (other than Excluded Accounts), upon the delivery of Blocked Account Agreements with respect thereto.

(v)        None of the Pledged Equity owned or held by such Grantor has been issued or transferred in violation of any securities registration, securities disclosure or similar laws of any jurisdiction to which such issuance or transfer may be subject.  In addition, no effective financing statement or other instrument similar in effect covering all or any part of the Pledged Equity is on file in any recording office, having been authorized by such Grantor, except (i) as may have been filed in favor of the Collateral Agent in furtherance of this Agreement or (ii) which will be released in connection with the execution of this Agreement.

(g)        No consent, approval, authorization, or other order or other action by, and no notice to or filing with, any Governmental Authority or any other Person is required (i) for the grant of a Security Interest by such Grantor in and to the Collateral pursuant to this Agreement or for the execution, delivery, or performance of this Agreement by such Grantor, or (ii) for the exercise by the Collateral Agent of the voting or other rights provided for in this Agreement with respect to the Investment Related Property or the remedies in respect of the Collateral pursuant to this Agreement, except as may be required in connection with such disposition of Investment Related Property by laws affecting the offering and sale of securities generally.

(h)        Each Grantor has generally maintained all of its Equipment in such condition, repair and working order in all material respects, ordinary wear and tear and casualty and condemnation excepted, as is sufficient for the purposes for which such Equipment is then being used by such Grantor and has made or caused to be made all repairs, replacements, and other

11

improvements in connection therewith, in each case, that were deemed necessary, in the reasonable business judgment of such Grantor (in such Grantor's sole discretion), to such end.

(i)     The name of any entity which a Grantor became the successor by merger, consolidation, acquisition, change in form, nature or jurisdiction of organization or otherwise, as of the Determination Date or at any time during the five years immediately preceding the Determination Date is listed on Schedule 10.

(j)     Schedule 11 lists (i) all locations in the United States of America at which any Grantor maintains any books or records relating to any of the Collateral consisting of Accounts, Instruments, Chattel Paper, General Intangibles or mobile goods, (ii) sets forth all locations in the United States of America where any tangible personal property having a value in excess of $100,000 of each Grantor is located and (iii) sets forth the names and addresses of all persons or entities other than the Grantors, such as lessees, consignees, warehousemen or purchasers of Chattel Paper, which have possession, of any Collateral having a value in excess of $100,000.

(k)     With respect to all of each Grantor's Inventory, (i) such Inventory (other than Inventory in transit, at a customer location subject to a valid servicing or lease agreement, or Inventory subject to maintenance or repair) is located at one of such Grantor's locations set forth on Schedules 8 and 11, (ii) no Inventory (other than Inventory in transit, at a customer location subject to a valid servicing or lease agreement, or Inventory subject to maintenance or repair) is now, or shall at any time or times hereafter be stored at any other location except as permitted by Section 6.11 of the Credit Agreement, (iii) such Grantor has good, indefeasible and merchantable title to such Inventory and such Inventory is not subject to any Lien or security interest or document whatsoever except for the Lien granted to the Collateral Agent, for the benefit of the Collateral Agent and the Secured Parties, and except for Permitted Liens, (iv) except as specifically disclosed in the most recent inventory report delivered to the Collateral Agent and the Revolving Agent, such Inventory is Eligible Inventory and (v) such Inventory is not subject to any licensing, patent, royalty, trademark, trade name or copyright agreements with any third parties which would require any consent of any third party upon sale or disposition of that Inventory or the payment of any monies to any third party upon such sale or other disposition.

6.     Covenants.  Each Grantor, jointly and severally, covenants and agrees with the Collateral Agent that from and after the date of this Agreement and until the date of termination of this Agreement in accordance with Section 23:

(a)     Possession of Collateral.  In the event that any Collateral, including Proceeds, is evidenced by or consists of Negotiable Collateral, or Chattel Paper, in each case with a fair market value in excess of $100,000 (and in the aggregate not to exceed $250,000), or consists of Investment Related Property, and if and to the extent that perfection or priority of the Collateral Agent's Security Interest is dependent on or enhanced by possession, the applicable Grantor, promptly upon the request of the Collateral Agent and in accordance with Section 8 hereof, shall execute such other documents and instruments as shall be reasonably requested by the Collateral Agent or, if applicable, endorse and deliver physical possession of such Negotiable Collateral, Investment Related Property, or Chattel Paper to the Collateral Agent, together with such undated powers endorsed in blank as shall be reasonably requested by the Collateral Agent.

12

(b)     Chattel Paper.

(i)     Each Grantor shall take all steps reasonably requested by the Collateral Agent necessary to grant the Collateral Agent, in accordance with the UCC, control of all electronic Chattel Paper having a fair market value in each individual case in excess of $100,000 or in the aggregate in excess of $250,000 and all "transferable records" (as that term is defined in Section 16 of the Uniform Electronic Transaction Act and Section 201 of the federal Electronic Signatures in Global and National Commerce Act as in effect in any relevant jurisdiction); and

(ii)     If any Grantor retains possession of any Chattel Paper or Instruments with a fair market value in each individual case in excess of $100,000 or in the aggregate in excess of $250,000 (which retention of possession shall be subject to the extent permitted hereby and by the Credit Agreement), promptly upon (and in any event within ten (10) Business Days, or such longer period as the Collateral Agent shall agree in its sole discretion, following) the request of the Collateral Agent, such Chattel Paper and Instruments shall be marked with the following legend: "This writing and the obligations evidenced or secured hereby are subject to the Security Interest of Cortland Capital Market Services LLC".

(c)     Blocked Account Agreements. Each Grantor shall obtain Blocked Account Agreements with respect to all of its Commodity Accounts, Deposit Accounts and Securities Accounts (in each case, other than Excluded Accounts), as and to the extent required pursuant to Section 6.15 of the Credit Agreement.

(d)     Letter of Credit Rights. Each Grantor that is or becomes the beneficiary of a letter of credit with a fair market value in each individual case in excess of $100,000 or in the aggregate in excess of $250,000 shall promptly (and in any event within ten (10) Business Days, or such longer period as the Collateral Agent shall agree in its sole discretion, after becoming a beneficiary) notify the Collateral Agent thereof and, upon the request by the Collateral Agent, use commercially reasonable efforts to enter into a tri-party agreement with the Collateral Agent and the issuer or confirmation bank with respect to letter-of-credit rights (as that term is defined in the UCC) assigning such letter-of-credit rights to the Collateral Agent and, if required by the Collateral Agent at any time during the continuance of an Event of Default, directing all payments thereunder to be made to the Collateral Agent, for the benefit of the Secured Parties, all in form and substance reasonably satisfactory to the Collateral Agent.

(e)     Commercial Tort Claims. Each Grantor shall, promptly (and in any event within ten (10) Business Days, or such longer period as the Collateral Agent shall agree in its sole discretion, of receipt thereof) notify the Collateral Agent in writing upon incurring or otherwise obtaining a Commercial Tort Claim with a value reasonably expected to exceed $100,000 after the date hereof against any third party and, upon request of the Collateral Agent, promptly amend Schedule 2, authorize the filing of additional financing statements or amendments to existing financing statements and do such other acts or things deemed necessary or advisable by the Collateral Agent in its reasonable discretion to give the Collateral Agent, for the benefit of the Secured Parties, a first priority, perfected security interest in any such Commercial Tort Claim.

(f)     Government Contracts. If any Account or Chattel Paper arises out of a contract or contracts with the United States of America or any department, agency, or

13

instrumentality thereof, Grantors shall promptly (and in any event within ten (10) Business Days, or such longer period as the Collateral Agent shall agree in its sole discretion) notify the Collateral Agent thereof in writing and thereafter, promptly execute any instruments or take any steps reasonably required by the Collateral Agent in order (x) that all moneys due or to become due under such contract or contracts shall, if required by the Collateral Agent at any time during the continuance of an Event of Default, be payable to the Collateral Agent, for the benefit of the Secured Parties, and (y) to give notice thereof under the Assignment of Claims Act or other Applicable Law.

(g)      Intellectual Property.

(i)      On the Agreement Date and upon the reasonable request of the Collateral Agent, in order to facilitate filings with the United States Patent and Trademark Office and the United States Copyright Office and as otherwise explicitly set forth herein, each Grantor shall execute and deliver to the Collateral Agent one or more Copyright Security Agreements, Trademark Security Agreements, and Patent Security Agreements to evidence the Collateral Agent's Lien on such Grantor's registered or applied for United States Patents, Trademarks and Copyrights; provided, however, that, notwithstanding anything herein to the contrary, no Grantor shall take, or be obliged to take, any action to perfect any security interest in any part of the Collateral consisting of Intellectual Property under the laws of any jurisdiction outside of the United States of America except to the extent such Intellectual Property is material to the business of any Grantor;

(ii)      Subject to such Grantor's reasonable business judgment, each Grantor shall, to the extent necessary to such Grantor's business, (A) take commercially reasonable steps to pursue and prosecute any application and preserve and maintain any material registration or issuance of each of such Grantor's Trademarks, Patents, Copyrights, and its rights therein, which may include (x) the filing of applications for renewal, affidavits of use, affidavits of noncontestability and opposition and interference and cancellation proceedings and (y) taking reasonable and appropriate steps including legal action to enforce the same, and (B) take commercially reasonable steps to prevent any lapse, abandonment, cancellation, dedication to the public, forfeiture, finding of unenforceability or any other impairment of any material Intellectual Property or which would adversely affect the validity, grant or enforceability of the security interest granted therein, in each case, other than by expiration, in the event that such Intellectual Property is no longer necessary or economically desirable in the operation of such Grantor's business;

(iii)      Grantors acknowledge and agree that the Collateral Agent shall have no duties with respect to the Trademarks, Patents, Copyrights, or Intellectual Property Licenses. Without limiting the generality of this Section 6(g), Grantors acknowledge and agree that the Collateral Agent shall not be under any obligation to take any steps necessary to preserve rights in the Trademarks, Patents, Copyrights, or Intellectual Property Licenses against any other Person, but the Collateral Agent may do so at its option solely during the continuance of an Event of Default and upon providing notice thereof to the applicable Grantor, and all reasonable and documented expenses incurred in connection therewith (including reasonable and documented fees and expenses of attorneys and other professionals) shall be reimbursed by the Borrower; and

14

(iv)     Each Grantor shall take commercially reasonable steps in accordance with standard industry practices to protect the secrecy of all trade secrets of such Grantor.

(h)     <u>Investment Related Property</u>.

(i)     If any Grantor shall receive or become entitled to receive any Pledged Equity after the Agreement Date, it shall, promptly (and in any event within ten (10) Business Days, or such longer period as the Collateral Agent shall agree in its sole discretion, of receipt thereof) deliver to the Collateral Agent, for the benefit of the Secured Parties, a duly executed Pledged Equity Addendum identifying such Pledged Equity;

(ii)     Each Grantor shall promptly deliver to the Collateral Agent a copy of each notice or other communication that is material to the interests of the Lenders received by it in respect of any Pledged Equity;

(iii)     No Grantor shall make or consent to any amendment or other modification or waiver with respect to any Pledged Equity, Pledged Operating Agreement or Pledged Partnership Agreement, or enter into any agreement or permit to exist any restriction with respect to any Pledged Equity, in each case, other than as permitted under the Credit Agreement;

(iv)     Each Grantor agrees that it will cooperate with the Collateral Agent in obtaining all necessary approvals and making all necessary filings under federal, state or local law in connection with perfecting the Security Interest on the Investment Related Property or, following the occurrence and during the continuance of an Event of Default, any sale or transfer thereof; and

(v)     In respect of all limited liability company or partnership interests constituting Pledged Equity, each Grantor hereby represents, warrants and covenants that such Pledged Equity (A) is not and shall not be dealt in or traded on securities exchanges or in securities markets, (B) does not and will not constitute investment company securities, and (C) is not and will not be held by such Grantor in a Securities Account.  In addition, (x) no such Pledged Equity is represented by a certificate as of the Determination Date, and no Pledged Equity shall become represented by a certificate following the Agreement Date and (y) none of the Pledged Operating Agreements, the Pledged Partnership Agreements, or any other agreements in respect of such Pledged Equity provide or shall provide that such Pledged Equity are securities governed by Article 8 of the Uniform Commercial Code as in effect in any relevant jurisdiction and, unless, in each case, any certificate representing such Pledged Equity is promptly delivered to the Collateral Agent together with an undated power with respect thereto, duly endorsed in blank by such Grantor.

(i)     <u>Transfers and Other Liens</u>.  The Grantors shall not (i) sell, assign (by operation of law or otherwise) or otherwise dispose of, or grant any option with respect to, any of the Collateral, except as permitted by the Credit Agreement, or (ii) create or permit to exist any Lien upon or with respect to any of the Collateral, except for Permitted Liens.  The inclusion of Proceeds in the Collateral shall not be deemed to constitute the Collateral Agent's consent to any

15

sale or other disposition of any of the Collateral except as expressly permitted in this Agreement or the other Loan Documents.

(j)        Each Grantor shall promptly (and in any event within ten (10) Business Days, or such longer period as the Collateral Agent may agree in its sole discretion, of acquiring or obtaining such Collateral) notify the Collateral Agent in writing (i) upon acquiring or otherwise obtaining after the Agreement Date any Investment Related Property, (ii) upon acquiring or otherwise obtaining after the Agreement Date any Chattel Paper (electronic, tangible or otherwise), documents (as defined in Article 9 of the UCC), promissory notes (as defined in the UCC), or Instruments, in each individual case with a fair market value in excess of $100,000 or in the aggregate in excess of $250,000, or (iii) of any amount payable to such Grantor under or in connection with any of the Collateral being or becoming evidenced after the Agreement Date by any Chattel Paper, documents, promissory notes, or Instruments, in each individual case with a fair market value in excess of $100,000 or in the aggregate in excess of $250,000.

(k)        General Intangibles.  To the extent that any asset purchase agreement or similar document in respect of any acquisition permitted under the Credit Agreement prohibits the grant of a security interest in any Grantor's interest therein (including any provision stating that such grant would constitute a default under, or give rise to the right to terminate, such agreement), such Grantor shall use commercially reasonable efforts to secure the consent to the granting of such security interest from each counterparty thereto on or prior to the date of consummation of such acquisition.  To the extent that any Material Contract or any other agreement which would otherwise constitute a material portion of the Collateral contains any enforceable provision prohibiting the grant of a security interest in any Grantor's interest therein (including any provision stating that such grant would constitute a default under, or give rise to the right to terminate, such agreement), such Grantor shall use commercially reasonable efforts to secure the consent to the granting of such security interest from each counterparty thereto promptly upon any request by the Collateral Agent to do so; provided, however, that if the applicable counterparty is an Affiliate of such Grantor, such Grantor shall be required to secure the consent of such Affiliate to the granting of a security interest promptly upon the Collateral Agent's request.

(l)        Updating of Schedules to this Agreement.  The Borrower will provide to each member of the Lender Group, concurrently with the delivery of the Compliance Certificate required to be delivered pursuant to Section 7.3 of the Credit Agreement, updated Schedules to this Agreement (or a certification to the Lender Group that the information contained in the Schedules provided to the Lender Group on the prior Determination Date remains unchanged).

(m)        Inventory.

(i)        Maintenance of Goods.  Such Grantor will do all things necessary to maintain, preserve, protect and keep its Inventory in saleable or useable condition, except for damaged or defective goods and consumption of Inventory arising in the ordinary course of such Grantor's business.

(ii)        Returned Inventory.  All returned Inventory shall be subject to the Collateral Agent's Liens thereon.  Whenever any Inventory is returned, the related Account shall

16

be deemed ineligible to the extent of the amount owing by the Account Debtor with respect to such returned Inventory.

(iii)     Inventory Reporting.  Such Grantor will maintain a perpetual Inventory reporting system at all times.

(n)     Receivables.

(i)     Certain Agreements on Receivables.  Such Grantor will not make or agree to make any discount, credit, rebate or other reduction in the original amount owing on a Receivable or accept in satisfaction of a Receivable less than the original amount thereof, except that, prior to the occurrence of an Event of Default, such Grantor may reduce the amount of Accounts arising from the sale, rental or use of Inventory in accordance with its present policies and in the ordinary course of business.

(ii)     Collection of Receivables.   Except as otherwise provided in this Agreement, such Grantor will collect and enforce, at such Grantor's sole expense, all amounts due or hereafter due to such Grantor under the Receivables owned by it.

(iii)     Delivery of Invoices.  Promptly after the request of the Collateral Agent or any other Agent, as applicable, such Grantor will deliver to the Collateral Agent or such other Agent, as applicable, duplicate invoices with respect to each Account owned by it bearing such language of assignment as the Collateral Agent or such other Agent, as applicable, shall specify.

(iv)     Disclosure of Counterclaims on Receivables.  If (A) any discount, credit or agreement to make a rebate or to otherwise reduce the amount owing on any Receivable owned by such Grantor exists and such discount, credit or rebate exceeds $50,000 or (B) if, to the knowledge of such Grantor, any dispute, setoff, claim, counterclaim or defense exists or has been asserted or threatened with respect to any such Receivable is in excess of $50,000 individually and $150,000 in the aggregate, such Grantor will promptly disclose such fact to the Collateral Agent and the Revolving Agent in the next Borrowing Base Report submitted by it.

7.     Relation to Other Security Documents.  The provisions of this Agreement shall be read and construed with the other Loan Documents referred to below in the manner so indicated.

(a)     Credit Agreement.  In the event of any conflict between any provision in this Agreement and a provision in the Credit Agreement, such provision of the Credit Agreement shall control.

(b)     Patent, Trademark, Copyright Security Agreements.  The provisions of the Copyright Security Agreements, Trademark Security Agreements, and Patent Security Agreements are supplemental to the provisions of this Agreement, and nothing contained in the Copyright Security Agreements, Trademark Security Agreements, or the Patent Security Agreements shall limit any of the rights or remedies of the Collateral Agent hereunder.

17

8.      Further Assurances.

(a)      Each Grantor agrees that from time to time, at its own expense, such Grantor will promptly execute and deliver all further instruments and documents, and take all further action, that may be necessary or that the Collateral Agent may request in its reasonable discretion, in order to perfect and protect any Security Interest granted or purported to be granted hereby or to enable the Collateral Agent to exercise and enforce its rights and remedies hereunder with respect to any of the Collateral.

(b)      Each Grantor authorizes the filing by the Collateral Agent of financing or continuation statements, or amendments thereto, and such Grantor will execute and deliver to the Collateral Agent such other instruments or notices, as may be necessary or as the Collateral Agent may request in its reasonable discretion, in order to perfect and preserve the Security Interest granted or purported to be granted hereby.

(c)      Each Grantor agrees to take, and hereby authorizes the Collateral Agent to take, all actions necessary to ensure the recordation of appropriate evidence of the Liens and security interest granted hereunder in any Intellectual Property (other than Intellectual Property Licenses, domain names and trade secrets), including, without limitation, the recordation of the Copyright Security Agreement(s) with the United States Copyright Office, the recordation of the Patent Security Agreement(s) and the Trademark Security Agreement(s) with the United States Patent and Trademark Office and, to the extent applicable and reasonably requested by the Collateral Agent, the foreign counterparts of any of the foregoing with respect to any Intellectual Property that is material to the business of any Grantor.

(d)      Each Grantor authorizes the Collateral Agent at any time and from time to time to file, transmit, or communicate, as applicable, financing statements and amendments (i) describing the Collateral as "all personal property of debtor" or "all assets of debtor" or words of similar effect, (ii) describing the Collateral as being of equal or lesser scope or with greater detail, or (iii) containing any information required by part 5 of Article 9 of the UCC for the sufficiency or filing office acceptance.

(e)      Each Grantor acknowledges that it is not authorized to file any financing statement or amendment or termination statement with respect to any financing statement filed in connection with this Agreement without the prior written consent of the Collateral Agent, subject to such Grantor's rights under Section 9-509(d)(2) of the UCC.

9.      The Collateral Agent's Right to Perform Contracts.  Upon the occurrence and during the continuance of an Event of Default, the Collateral Agent (or its designee) may proceed to perform (but shall be under no obligation to perform) any and all of the obligations of any Grantor contained in any contract, lease, or other agreement constituting Collateral and exercise any and all rights of any Grantor therein contained as fully as such Grantor itself could.

10.      The Collateral Agent Appointed Attorney-in-Fact.  Each Grantor hereby irrevocably appoints the Collateral Agent its attorney-in-fact, with full authority in the place and stead of such Grantor and in the name of such Grantor or otherwise, at such time as an Event of Default has occurred and is continuing under the Credit Agreement, to take any action and to

18

execute any instrument which the Collateral Agent may deem necessary or advisable to accomplish the purposes of this Agreement, including:

(a)     to ask, demand, collect, recover, compromise, receive and give acquittance and receipts for moneys due and to become due under or in connection with the Accounts or any other Collateral of such Grantor;

(b)     to receive and open all mail addressed to such Grantor and to notify postal authorities to change the address for the delivery of mail to such Grantor to that of the Collateral Agent;

(c)     to receive, indorse, and collect any Instruments, Documents, Negotiable Collateral, Chattel Paper or other Receivables;

(d)     to file any claims or take any action or institute any proceedings which the Collateral Agent may deem necessary or desirable for the collection of any of the Collateral of such Grantor or otherwise to enforce the rights of the Collateral Agent with respect to any of the Collateral;

(e)     to repair, alter, or supply goods, if any, necessary to fulfill in whole or in part the purchase order of any Person obligated to such Grantor in respect of any Account of such Grantor;

(f)     subject to Section 16(c), to use any Equipment, Fixtures, furniture, machinery, labels, Intellectual Property, advertising matter or other industrial or intellectual property rights which constitute Collateral, in advertising for sale and selling Inventory and other Collateral and to collect any amounts due under Accounts, contracts or Negotiable Collateral of such Grantor;

(g)     to prepare, sign, and file for recordation in any intellectual property registry, appropriate evidence of the Lien and security interest granted herein in any Intellectual Property in the name of any Grantor as debtor;

(h)     to bring suit in its own name to enforce such Grantor's Trademarks, Patents, Copyrights and (solely to the extent of such Grantor's rights therein) Intellectual Property Licenses and, if the Collateral Agent shall commence any such suit, such Grantor shall, at the request of the Collateral Agent, do any and all lawful acts and execute any and all proper documents required by the Collateral Agent in aid of such enforcement; and

(i)     to give notice of and exercise sole control of any Blocked Account or to give any other instruction under any Blocked Account Agreement and take any action therein with respect to such Collateral.

To the extent permitted by law, each Grantor hereby ratifies all that such attorney-in-fact shall lawfully do or cause to be done by virtue hereof.  This power of attorney is coupled with an interest and shall be irrevocable until this Agreement is terminated.

19

11.     The Collateral Agent May Perform.  If any of the Grantors fail to perform any agreement contained herein, the Collateral Agent may itself perform, or cause performance of, such agreement, and the reasonable expenses of the Collateral Agent incurred in connection therewith shall be payable, jointly and severally, by the Grantors.

12.     The Collateral Agent's Duties.  The powers conferred on the Collateral Agent hereunder are solely to protect the Collateral Agent's interest in the Collateral and shall not impose any duty upon the Collateral Agent to exercise any such powers.  The Collateral Agent shall have no duty as to any Collateral or as to the taking of any necessary steps to preserve rights against prior parties or any other rights pertaining to any Collateral. The Collateral Agent shall be deemed to have exercised reasonable care in the custody and preservation of any Collateral in its actual possession if such Collateral is accorded treatment substantially equal to that which the Collateral Agent accords its own similar property.

13.     Collection of Receivables.  At any time upon the occurrence and during the continuation of an Event of Default, the Collateral Agent or the Collateral Agent's designee may (a) notify Account Debtors of any Grantor that the Accounts, General Intangibles, Chattel Paper, Negotiable Collateral or other Receivables have been assigned to the Collateral Agent, or that the Collateral Agent has a security interest therein, and (b) collect the Accounts, General Intangibles, Negotiable Collateral and other Receivables directly, and any collection costs and expenses shall constitute part of such Grantor's Secured Obligations under the Loan Documents.

14.     Disposition of Pledged Equity by the Collateral Agent.  None of the Pledged Equity existing as of the date of this Agreement is, and none of the Pledged Equity hereafter acquired on the date of acquisition thereof will be, registered or qualified under the various federal or state securities laws of the United States and disposition thereof after an Event of Default may be restricted to one or more private (instead of public) sales in view of the lack of such registration. Each Grantor understands that, in connection with such disposition, the Collateral Agent may approach only a restricted number of potential purchasers and further understands that a sale under such circumstances may yield a lower price for the Pledged Equity than if the Pledged Equity were registered and qualified pursuant to federal and state securities laws and sold on the open market. Each Grantor, therefore, agrees that: (a) if the Collateral Agent shall, pursuant to the terms of this Agreement, sell or cause the Pledged Equity or any portion thereof to be sold at a private sale, the Collateral Agent shall have the right to rely upon the advice and opinion of any nationally recognized brokerage or investment firm (but shall not be obligated to seek such advice and the failure to do so shall not be considered in determining the commercial reasonableness of such action) as to the best manner in which to offer the Pledged Equity or any portion thereof for sale and as to the best price reasonably obtainable at the private sale thereof; and (b) such reliance shall be conclusive evidence that the Collateral Agent has handled the disposition in a commercially reasonable manner.

15.     Voting Rights.

       (a)     Upon the occurrence and during the continuation of an Event of Default, (i) the Collateral Agent may, at its option and in addition to all rights and remedies available to the Collateral Agent under any other agreement, at law, in equity, or otherwise, exercise all voting rights, and all other ownership or consensual rights in respect of the Pledged Equity owned by

20

such Grantor, but under no circumstances is the Collateral Agent obligated by the terms of this Agreement to exercise such rights, and (ii) if the Collateral Agent duly exercises its right to vote any of such Pledged Equity, each Grantor hereby appoints the Collateral Agent, such Grantor's true and lawful attorney-in-fact and IRREVOCABLE PROXY to vote such Pledged Equity and to exercise all other rights, powers, privileges and remedies to which a holder of the Pledged Equity would be entitled (including giving or withholding written consents of shareholders, partners or members, as the case may be, calling special meetings of shareholders, partners or members, as the case may be, and voting at such meetings) in any manner the Collateral Agent deems advisable, which proxy shall be effective, automatically and without the necessity of any action (including any transfer of any Pledged Equity on the record books of the issuer thereof) by any other person (including the issuer of such Pledged Equity or any officer or agent thereof) during the continuance of an Event of Default and which proxy shall only terminate upon Payment in Full.

(b)     For so long as any Grantor shall have the right to vote the Pledged Equity owned by it, such Grantor covenants and agrees that it will not, without the prior written consent of the Collateral Agent, vote or take any consensual action with respect to such Pledged Equity which would adversely affect the rights of the Collateral Agent or the Secured Parties or the value of the Pledged Equity.

(c)     Each Grantor hereby expressly and irrevocably authorizes and instructs, without any further instructions from such Grantor, each issuer of any Pledged Equity (i) to comply with any instruction received by it from the Collateral Agent in writing that states that an Event of Default is continuing and is otherwise in accordance with the terms of this Agreement and the Credit Agreement, and each Grantor agrees that such issuer shall be fully protected from liabilities to such Grantor in so complying, and (ii) except as otherwise permitted hereunder or under the Credit Agreement, following the receipt of instructions from the Collateral Agent contemplated by clause (c)(i) above, to pay any dividend or to make any other distribution with respect to the Pledged Equity directly to the Collateral Agent.

16.     <u>Remedies</u>.  Upon the occurrence and during the continuance of an Event of Default:

(a)     The Collateral Agent may exercise in respect of the Collateral, in addition to other rights and remedies provided for herein, in the other Loan Documents, or otherwise available to it, all the rights and remedies of a secured party on default under the UCC or any other Applicable Law.  Without limiting the generality of the foregoing, each Grantor expressly agrees that, in any such event, the Collateral Agent without demand of performance or other demand, advertisement or notice of any kind (except a notice specified below of time and place of public or private sale) to or upon any of Grantors or any other Person (all and each of which demands, advertisements and notices are hereby expressly waived to the maximum extent permitted by the UCC or any other Applicable Law), may take immediate possession of all or any portion of the Collateral and (i) enter upon the premises where any Collateral is located, without any obligation to pay rent, through self-help, without judicial process, without first obtaining a final judgment or giving any Grantor or any other Person notice or opportunity for a hearing on Collateral Agent's claim of action, (ii) collect, receive, appropriate and realize upon any Collateral and (iii) without notice except as specified below, sell, assign, convey, transfer, grant option or options to purchase and deliver (and enter into contractual obligations to do any of the foregoing) the Collateral or any

21

part thereof in one or more parcels at public or private sale, at any of the Collateral Agent's offices or elsewhere, for cash, on credit, and upon such other terms as the Collateral Agent may deem commercially reasonable. Each Grantor agrees that, to the extent notice of sale shall be required by law, at least ten (10) days' notice to any of Grantors of the time and place of any public sale or the time after which any private sale is to be made shall constitute reasonable notification and specifically such notice shall constitute a reasonable "authenticated notification of disposition" within the meaning of Section 9-611 of the UCC. The Collateral Agent shall not be obligated to make any sale of Collateral regardless of notice of sale having been given. The Collateral Agent may adjourn any public or private sale from time to time by announcement at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned.

(b)     The Collateral Agent may (i) require Grantors to, and each Grantor hereby agrees that it will at its own expense and upon request of the Collateral Agent, promptly assemble all or part of the Collateral as directed by the Collateral Agent and make it available to the Collateral Agent at one or more locations where such Grantor regularly maintains Inventory or such other location as the Collateral Agent may request, (ii) require that each Grantor store and keep any Collateral pending further action by the Collateral Agent and, while any such Collateral is so stored or kept, provide such maintenance services as shall be necessary to protect the same and to preserve and maintain such Collateral in good condition, (iii) until the Collateral Agent is able to sell, assign, convey or transfer any Collateral, the Collateral Agent shall have the right to hold or use such Collateral to the extent that it deems appropriate for the purpose of preserving the Collateral or its value or for any other purpose deemed appropriate by the Collateral Agent and (iv) if it so elects, seek the appointment of a receiver or keeper to take possession of any Collateral and to enforce any of the Collateral Agent's remedies (for the benefit of the Secured Parties), with respect to such appointment without prior notice or hearing as to such appointment. The Collateral Agent shall exercise the same degree of care for the Collateral that the Collateral Agent would use for similar assets owned by the Collateral Agent while such Collateral is in the possession or under the control of the Collateral Agent.

(c)     Subject to the final paragraph of Section 2 hereof, for the purpose of enabling the Collateral Agent to exercise rights and remedies under this Agreement at such time as the Collateral Agent shall be lawfully entitled to exercise such rights and remedies, each Grantor hereby grants to the Collateral Agent a non-exclusive license, without liability for royalties or any other charge, to use such Grantor's Intellectual Property or any property of a similar nature, owned by any of Grantors or with respect to which any of Grantors have rights under license, sublicense or other agreements to grant such rights to the Collateral Agent, as it pertains to the Collateral, in preparing for sale, advertising for sale and selling any Collateral, and each Grantor's rights under all licenses shall inure to the benefit of the Collateral Agent in each case, to the extent permitted under applicable licenses or as permitted under Applicable Law. This license (i) shall be subject to those Intellectual Property Licenses granted by the Grantors in effect on the date hereof and those granted by any Grantor hereafter, as permitted under the Loan Documents, to the extent not conflicting, (ii) may be exercised, at the option of the Collateral Agent, only upon the occurrence and during the continuation of an Event of Default, provided, that any license, sublicense or other transaction entered into by any Secured Party in accordance herewith shall be binding upon the Grantors notwithstanding any subsequent cure of an Event of Default, and (iii) apply the use of

22

the Trademarks in connection with goods and services of similar type and quality of those theretofore sold by such Grantor under such Trademark.

(d)      Any cash held by the Collateral Agent as Collateral and all cash proceeds received by the Collateral Agent in respect of any sale of, collection from or other realization upon all or any part of the Collateral, after deducting all reasonable and documented costs and expenses of every kind incurred in connection therewith or incidental to the care or safekeeping of any Collateral or in any way relating to the Collateral or the rights of Collateral Agent and any other Secured Party, including reasonable and documented attorneys' fees and disbursements, shall be applied against the Secured Obligations in accordance with Section 2.10 of the Credit Agreement. In the event the proceeds of Collateral are insufficient to satisfy all of the Secured Obligations in full, each Grantor shall remain jointly and severally liable for any such deficiency.

(e)      In addition to, and not in substitution for, any similar requirement in the Credit Agreement, if required by the Collateral Agent at any time during the continuance of an Event of Default, any payment of Accounts or payment in respect of General Intangibles, when collected by any Grantor, shall be promptly (and, in any event, within two (2) Business Days) deposited by such Grantor in the exact form received, duly indorsed by such Grantor to the Collateral Agent, in a Blocked Account, subject to withdrawal by the Collateral Agent as provided in subsection (f) below.  Until so turned over, such payment shall be held by such Grantor in trust for the Collateral Agent, segregated from other funds of such Grantor.

(f)      Unless otherwise expressly provided in the Credit Agreement or this Agreement, during the continuance of an Event of Default, all proceeds of any Collateral received by any Grantor hereunder in cash or Cash Equivalents shall be held by such Grantor in trust for the Collateral Agent and the other Secured Parties, segregated from other funds of such Grantor, and shall, promptly upon receipt by any Grantor, be turned over to the Collateral Agent in the exact form received with any necessary endorsement.  All such proceeds of Collateral and any other proceeds of any Collateral received by the Collateral Agent in cash or Cash Equivalents shall be held by the Collateral Agent in a Blocked Account.  All proceeds being held by the Collateral Agent in a Blocked Account (or by such Grantor in trust for the Collateral Agent and the other Secured Parties) shall continue to be held as collateral security for the Secured Obligations and shall not constitute payment thereof until applied as provided in the Credit Agreement.

(g)      Without limiting any of the foregoing, during the continuance of an Event of Default, the Collateral Agent may exercise, in addition to all other rights and remedies granted to it in this Agreement and in any other instrument or agreement securing, evidencing or relating to any Secured Obligation, all rights and remedies of a secured party under the UCC or any other Applicable Law.

(h)      Each Grantor hereby acknowledges that the Secured Obligations arose out of a commercial transaction, and agrees that if an Event of Default shall occur and be continuing the Collateral Agent shall have the right to an immediate writ of possession without notice of a hearing.  The Collateral Agent shall, to the extent permitted by Applicable Law, have the right to the appointment of a receiver for the Collateral of each Grantor, and each Grantor hereby consents to such rights and such appointment and hereby waives any objection such Grantor may have thereto or the right to have a bond or other security posted by the Collateral Agent.

23

17.     Remedies Cumulative.  Each right, power, and remedy of the Collateral Agent as provided for in this Agreement or in the other Loan Documents or now or hereafter existing at law or in equity or by statute or otherwise shall be cumulative and concurrent and shall be in addition to every other right, power, or remedy provided for in this Agreement or in the other Loan Documents or now or hereafter existing at law or in equity or by statute or otherwise, and the exercise or beginning of the exercise by the Collateral Agent, of any one or more of such rights, powers, or remedies shall not preclude the simultaneous or later exercise by the Collateral Agent of any or all such other rights, powers, or remedies.

18.     Commercially Reasonable.  To the extent that Applicable Law imposes duties on Collateral Agent to exercise remedies in a commercially reasonable manner, each Grantor acknowledges and agrees that it is not commercially unreasonable for Collateral Agent to do any of the following:

(a)     fail to incur significant costs, expenses or other liabilities reasonably deemed as such by Collateral Agent to prepare any Collateral for disposition or otherwise to complete raw material or work in process into finished goods or other finished products for disposition;

(b)     fail to obtain permits, or other consents, for access to any Collateral to sell or for the collection or sale of any Collateral, or, if not required by Applicable Law, fail to obtain permits or other consents for the collection or disposition of any Collateral;

(c)     fail to exercise remedies against Account Debtors or other Persons obligated on any Collateral or to remove Liens on any Collateral or to remove any adverse claims against any Collateral;

(d)     advertise dispositions of any Collateral through publications or media of general circulation, whether or not such Collateral is of a specialized nature, or to contact other Persons, whether or not in the same business as any Grantor, for expressions of interest in acquiring any such Collateral;

(e)     exercise collection remedies against Account Debtors and other Persons obligated on any Collateral, directly or through the use of collection agencies or other collection specialists, hire one or more professional auctioneers to assist in the disposition of any Collateral, whether or not such Collateral is of a specialized nature, or, to the extent deemed appropriate by Collateral Agent, obtain the services of other brokers, investment bankers, consultants and other professionals to assist Collateral Agent in the collection or disposition of any Collateral, or utilize Internet sites that provide for the auction of assets of the types included in the Collateral or that have the reasonable capacity of doing so, or that match buyers and sellers of assets to dispose of any Collateral;

(f)     dispose of assets in wholesale rather than retail markets;

(g)     disclaim disposition warranties, such as title, possession or quiet enjoyment; or

24

(h)     purchase insurance or credit enhancements to insure the Collateral Agent against risks of loss, collection or disposition of any Collateral or to provide to the Collateral Agent a guaranteed return from the collection or disposition of any Collateral.

Each Grantor acknowledges that the purpose of this <u>Section 18</u> is to provide a non-exhaustive list of actions or omissions that are commercially reasonable when exercising remedies against any Collateral and that other actions or omissions by Collateral Agent or any Secured Party shall not be deemed commercially unreasonable solely on account of not being indicated in this <u>Section 18</u>. Without limitation upon the foregoing, nothing contained in this <u>Section 18</u> shall be construed to grant any rights to any Grantor or to impose any duties on Collateral Agent that would not have been granted or imposed by this Agreement or by Applicable Law in the absence of this <u>Section 18</u>.

19.     <u>Marshaling</u>.  The Collateral Agent shall not be required to marshal any present or future collateral security (including but not limited to the Collateral) for, or other assurances of payment of, the Secured Obligations or any of them or to resort to such collateral security or other assurances of payment in any particular order, and all of its rights and remedies hereunder and in respect of such collateral security and other assurances of payment shall be cumulative and in addition to all other rights and remedies, however existing or arising.  To the extent that it lawfully may, each Grantor hereby agrees that it will not invoke any law relating to the marshaling of collateral which might cause delay in or impede the enforcement of the Collateral Agent's rights and remedies under this Agreement or under any other instrument creating or evidencing any of the Secured Obligations or under which any of the Secured Obligations is outstanding or by which any of the Secured Obligations is secured or payment thereof is otherwise assured, and, to the extent that it lawfully may, each Grantor hereby irrevocably waives the benefits of all such laws.

20.     <u>Account Verification</u>.  The Collateral Agent or any other Agent, as applicable, may at any time, in such Agent's own name, in the name of a nominee of such Agent, or in the name of any Grantor communicate (by mail, telephone, facsimile or otherwise) with the Account Debtors of any such Grantor, parties to contracts with any such Grantor and obligors in respect of Instruments of any such Grantor to verify with such Persons, to such Agent's satisfaction, the existence, amount, terms of, and any other matter relating to, Accounts, Instruments, Chattel Paper, payment intangibles and/or other Receivables.

21.     <u>Merger, Amendments; Etc.</u>

(a)     THIS WRITTEN AGREEMENT, TOGETHER WITH THE OTHER LOAN DOCUMENTS, REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.   THERE ARE NO UNWRITTEN AGREEMENTS BETWEEN THE PARTIES.

(b)     No waiver of any provision of this Agreement, and no consent to any departure by any of Grantors herefrom, shall in any event be effective unless the same shall be in writing and signed by the Collateral Agent, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.  No amendment of any provision of this Agreement shall be effective unless the same shall be in writing and signed by the Collateral Agent and each of Grantors to which such amendment applies.

25

22.     Addresses for Notices.   All notices and other communications provided for hereunder shall be given in the form and manner and delivered to the Collateral Agent at its address specified in the Credit Agreement, and to any of the Grantors at their respective addresses specified in the Credit Agreement or, as to any party, at such other address as shall be designated by such party in a written notice to the other party.

23.     Continuing Security Interest: Assignments under Credit Agreement.   This Agreement shall create a continuing security interest in the Collateral and shall (a) remain in full force and effect until Payment in Full, (b) be binding upon each of the Grantors, and their respective successors and assigns, and (c) inure to the benefit of, and be enforceable by, the Collateral Agent, and its successors, transferees and assigns.  Without limiting the generality of the foregoing clause (c), the Collateral Agent may, in accordance with the provisions of the Credit Agreement, assign or otherwise transfer all or any portion of its rights and obligations under the Credit Agreement to any other Person, and such other Person shall thereupon become vested with all the benefits in respect thereof granted to such Collateral Agent herein or otherwise.  Upon Payment in Full, the Security Interest granted hereby shall terminate and all rights to the Collateral shall revert to the Grantors or any other Person entitled thereto.  Upon any sale or other transfer by any Borrower Party (other than to Holdings, the Borrower or any Subsidiary Guarantor) of any Collateral in a transaction permitted under the Credit Agreement, or upon the effectiveness of any written consent to the release of the security interest in such Collateral created under any Security Document in accordance with Section 15.2 of the Credit Agreement, the security interest in such Collateral created by the Security Documents shall be automatically released and such Borrower Party shall be released from all its obligations hereunder with respect to such Collateral.  At such time, the Collateral Agent will authorize the filing of appropriate termination statements to terminate such Security Interests.  No transfer or renewal, extension, assignment, or termination of this Agreement or of the Credit Agreement, any other Loan Document, or any other instrument or document executed and delivered by any Grantor to the Collateral Agent nor any additional Advances or other loans made by the Collateral Agent or any Collateral Agent to the Borrower, nor the taking of further security, nor the retaking or re-delivery of the Collateral to Grantors, or any of them, by the Collateral Agent shall release any of Grantors from any obligation, except a release or discharge executed in writing by the Collateral Agent in accordance with the provisions of the Credit Agreement.  The Collateral Agent shall not by any act, delay, omission or otherwise be deemed to have waived any of its rights or remedies hereunder, unless such waiver is in writing and signed by the Collateral Agent and then only to the extent therein set forth.  A waiver by the Collateral Agent of any right or remedy on any occasion shall not be construed as a bar to the exercise of any such right or remedy which the Collateral Agent would otherwise have had on any other occasion.

24.     Governing Law.  All matters arising out of, in connection with or relating to this Agreement, including, without limitation, their validity, interpretation, construction, performance and enforcement (including, without limitation, any claims sounding in contract or tort law arising out of the subject matter hereof or thereof and any determinations with respect to post-judgment interest), shall be construed in accordance with and governed by the laws of the State of New York.

25. <u>Jurisdiction and Waiver</u>.

(a) <u>Jurisdiction</u>. EACH GRANTOR AND THE COLLATERAL AGENT HEREBY IRREVOCABLY SUBMITS TO THE PERSONAL JURISDICTION OF THE FEDERAL AND STATE COURTS SITTING IN THE COUNTY OF NEW YORK, STATE OF NEW YORK AND EACH GRANTOR HEREBY IRREVOCABLY DESIGNATES AND APPOINTS, AS ITS AUTHORIZED AGENT FOR SERVICE OF PROCESS IN THE STATE OF NEW YORK, THE BORROWER, OR SUCH OTHER PERSON AS SUCH GRANTOR SHALL DESIGNATE HEREAFTER BY WRITTEN NOTICE GIVEN TO THE COLLATERAL AGENT. THE CONSENT TO JURISDICTION HEREIN SHALL BE EXCLUSIVE; <u>PROVIDED</u> THAT THE SECURED PARTIES, OR ANY OF THEM, RETAINS THE RIGHT TO BRING PROCEEDINGS AGAINST ANY GRANTOR IN THE COURTS OF ANY OTHER JURISDICTION IN CONNECTION WITH THE EXERCISE OF ANY RIGHTS UNDER ANY SECURITY DOCUMENT OR THE ENFORCEMENT OF ANY JUDGMENT. THE SECURED PARTIES SHALL FOR ALL PURPOSES AUTOMATICALLY, AND WITHOUT ANY ACT ON THEIR PART, BE ENTITLED TO TREAT SUCH DESIGNEE OF EACH GRANTOR AS THE AUTHORIZED AGENT TO RECEIVE FOR AND ON BEHALF OF SUCH GRANTOR SERVICE OF WRITS, OR SUMMONS OR OTHER LEGAL PROCESS IN THE STATE OF NEW YORK, WHICH SERVICE SHALL BE DEEMED EFFECTIVE PERSONAL SERVICE ON SUCH GRANTOR SERVED WHEN DELIVERED, WHETHER OR NOT SUCH AGENT GIVES NOTICE TO SUCH GRANTOR; AND DELIVERY OF SUCH SERVICE TO ITS AUTHORIZED AGENT SHALL BE DEEMED TO BE MADE WHEN PERSONALLY DELIVERED OR THREE (3) BUSINESS DAYS AFTER MAILING BY REGISTERED OR CERTIFIED MAIL ADDRESSED TO SUCH AUTHORIZED AGENT. EACH PARTY HERETO FURTHER IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL TO, IN THE CASE OF THE GRANTORS, SUCH GRANTOR AT THE ADDRESS SET FORTH HEREIN, SUCH SERVICE TO BECOME EFFECTIVE THREE (3) BUSINESS DAYS AFTER SUCH MAILING. IN THE EVENT THAT, FOR ANY REASON, SUCH AGENT OR ITS SUCCESSORS SHALL NO LONGER SERVE AS AGENT OF EACH GRANTOR TO RECEIVE SERVICE OF PROCESS IN THE STATE OF NEW YORK, EACH GRANTOR SHALL SERVE AND ADVISE THE COLLATERAL AGENT THEREOF SO THAT AT ALL TIMES EACH GRANTOR WILL MAINTAIN AN AGENT TO RECEIVE SERVICE OF PROCESS IN THE STATE OF NEW YORK ON BEHALF OF SUCH GRANTOR WITH RESPECT TO THIS AGREEMENT AND ALL OTHER LOAN DOCUMENTS. IN THE EVENT THAT, FOR ANY REASON, SERVICE OF LEGAL PROCESS CANNOT BE MADE IN THE MANNER DESCRIBED ABOVE, SUCH SERVICE MAY BE MADE IN SUCH MANNER AS PERMITTED BY LAW.

(b) <u>Consent to Venue</u>. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES ANY OBJECTION IT WOULD MAKE NOW OR HEREAFTER FOR THE LAYING OF VENUE OF ANY SUIT, ACTION, OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT BROUGHT IN THE FEDERAL COURTS OF THE UNITED STATES AND STATE COURTS SITTING IN NEW YORK COUNTY, NEW YORK, AND HEREBY IRREVOCABLY WAIVES ANY CLAIM

27

THAT ANY SUCH SUIT, ACTION, OR PROCEEDING HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

(c)    Waiver of Jury Trial.   EACH GRANTOR AND EACH SECURED PARTY, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, WAIVES, AND OTHERWISE AGREES NOT TO REQUEST, A TRIAL BY JURY IN ANY COURT AND IN ANY ACTION, PROCEEDING OR COUNTERCLAIM OF ANY TYPE IN WHICH ANY GRANTOR, ANY SECURED PARTY OR ANY OF THEIR RESPECTIVE SUCCESSORS OR ASSIGNS IS A PARTY, AS TO ALL MATTERS AND THINGS ARISING DIRECTLY OR INDIRECTLY OUT OF THIS AGREEMENT, THE OTHER LOAN DOCUMENTS, AND THE RELATIONS AMONG THE PARTIES LISTED IN THIS SECTION 25.

26.    New Subsidiaries.   Except to the extent not required by Section 6.20 of the Credit Agreement, any new direct or indirect Subsidiary (whether by acquisition or creation) of a Grantor is required to enter into this Agreement by executing and delivering in favor of the Collateral Agent a supplement to this Agreement in the form of Annex 1 attached hereto.  Upon the execution and delivery of Annex 1 by such new Subsidiary, such Subsidiary shall become a Grantor hereunder with the same force and effect as if originally named as a Grantor herein.  The execution and delivery of any instrument adding an additional Grantor as a party to this Agreement shall not require the consent of any Grantor hereunder.  The rights and obligations of each Grantor hereunder shall remain in full force and effect notwithstanding the addition of any new Grantor hereunder.

27.    Consent to Pledged Equity.

(a)    Each Grantor and each of its Subsidiaries, in its respective capacity as an issuer of Pledged Equity (in such capacity, an "Issuer"), hereby (i) consents to the grant by each other Grantor to the Collateral Agent, for the benefit of the Secured Parties, of the Security Interest on all of the Pledged Equity, (ii) represents to the Collateral Agent that it has no rights of setoff or other claims against any of the Pledged Equity, (iii) acknowledges and agrees that it shall, upon demand by the Collateral Agent, pay to the Collateral Agent, for the benefit of the Secured Parties, any dividends and distributions due to any Grantor in accordance with the terms hereof, and (iv) consents to the transfer of such Pledged Equity to the Collateral Agent or its nominee following an Event of Default and to the substitution of the Collateral Agent or its nominee as a partner in any partnership or as a member in any limited liability company with all the rights and powers related thereto.

(b)    Each Grantor hereby authorizes and instructs each Issuer to comply with any instruction received by it from the Collateral Agent in writing that (i) states that an Event of Default has occurred and is continuing and (ii) is otherwise in accordance with the terms of this Agreement, without any other or further instructions from such Grantor.

28.    Miscellaneous.

(a)    This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all such separate counterparts shall together constitute but one and the same agreement.  In proving this Agreement in any judicial proceedings, it shall

not be necessary to produce or account for more than one such counterpart signed by the party against whom such enforcement is sought. Any signatures hereto delivered by Electronic Transmission shall be deemed an original signature hereto.

(b)    Any provision of this Agreement which is prohibited or unenforceable shall be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof in that jurisdiction or affecting the validity or enforceability of such provision in any other jurisdiction.

(c)    Headings used in this Agreement are for convenience only and shall not be used in connection with the interpretation of any provision hereof.

(d)    The pronouns used herein shall include, when appropriate, either gender and both singular and plural, and the grammatical construction of sentences shall conform thereto.

(e)    Unless the context of this Agreement or any other Loan Document clearly requires otherwise, references to the plural include the singular, references to the singular include the plural, the terms "includes" and "including" are not limiting, and the term "or" has, except where otherwise indicated, the inclusive meaning represented by the phrase "and/or." The words "hereof," "herein," "hereby," "hereunder," and similar terms in this Agreement or any other Loan Document refer to this Agreement or such other Loan Document, as the case may be, as a whole and not to any particular provision of this Agreement or such other Loan Document, as the case may be. Section, subsection, clause, schedule, and exhibit references herein are to this Agreement unless otherwise specified. Any reference in this Agreement or in any other Loan Document to any agreement, instrument, or document shall include all alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements, thereto and thereof, as applicable (subject to any restrictions on such alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements set forth herein). Any reference herein to any Person shall be construed to include such Person's successors and assigns. Any requirement of a writing contained herein or in any other Loan Document shall be satisfied by the transmission of a Record or any other Electronic Transmission and any Record or any other Electronic Transmission so transmitted shall constitute a representation and warranty as to the accuracy and completeness of the information contained therein.

29.    <u>Construction; Intercreditor Agreement</u>.    The terms of this Agreement shall be subject in all respects to the terms of the Intercreditor Agreement. To the extent any provision of this Agreement conflicts with the Intercreditor Agreement, the Intercreditor Agreement shall control.

[remainder of page left blank intentionally]

29

       IN WITNESS WHEREOF, the undersigned parties hereto have executed this Agreement by and through their duly authorized officers, as of the day and year first above written.

**GRANTORS:**

**AZTEC / SHAFFER, LLC**

By: _____

Name: A. KELLY WILLIAMS

Title: Managing Director

**ASAIG, LLC**

By: _____

Name: A. KELLY WILL, AMS

Title: Manager

[Signature Page to First Lien Security Agreement]

**COLLATERAL AGENT:**          **CORTLAND CAPITAL MARKET SERVICES LLC**

By: _____
Name:  Joseph Mascherin
Title:   Associate Counsel

## SCHEDULE 1

TRADE NAMES; ORGANIZATIONAL IDENTIFICATION NUMBERS; CHIEF
EXECUTIVE OFFICES

## TRADE NAMES

- Aztec / Shaffer
- Aztec Events & Tents
- Shaffer Sports[1]
- Shaffer Sports & Events
- Shaffer Sports Events[2]

## ORGANIZATIONAL IDENTIFICATION NUMBERS

- Aztec / Shaffer, LLC – 0802194862
- ASAIG, LLC – 0803217734

## JURISDICTION OF ORGANIZATION

- Aztec / Shaffer, LLC – Texas
- ASAIG, LLC – Texas

## CHIEF EXECUTIVE OFFICES AND LOCATIONS WHERE RECORDS CONCERNING COLLATERAL ARE KEPT

- 601 W. 6th Street, Houston, TX 77007
- 3316 W. 11th Street, Houston, TX 77007
- 2630 Fifth Avenue, Irondale, AL 35210
- 707 W. 6th Street, Houston, Harris County, Texas

---

[1] This is the name under which the PGA Tour, Inc. contract was executed.

[2] This is the name under which the contracts with Colonial Country Club and Pro Links Sports were executed.

## **SCHEDULE 2**

COMMERCIAL TORT CLAIMS

None.

## **SCHEDULE 3**

COPYRIGHTS

None.

# **SCHEDULE 4**

INTELLECTUAL PROPERTY LICENSES

None.

## **SCHEDULE 5**

PATENTS

None.

## SCHEDULE 6

PLEDGED COMPANIES

| Pledgor | Pledged Company | Percent of Pledged Company's Outstanding Equity Interests Owned by Pledgor | Percent of Pledged Company's Outstanding Equity Interests Owned by Pledgor Which are Being Pledged |
|---|---|---|---|
| ASAIG, LLC | Aztec / Shaffer, LLC | 100% | 100% |

## SCHEDULE 7

TRADEMARKS

| Grantor | Mark | Application/ Registration No. | App/Reg Date |
|---------|------|-------------------------------|--------------|
| Aztec / Shaffer, LLC | Shaffer Sports & Events | 5430921 | March 27, 2018 |
| Aztec / Shaffer, LLC | Aztec Events & Tents | 5309303 | October 17, 2017 |

## **SCHEDULE 8**

REAL PROPERTY

**Owned Real Property:**

None.

**Leased Real Property:**

| Lessee | Lessor | Address |
|---|---|---|
| Aztec / Shaffer, LLC | Todd M. and Paige S. Johnson Family Trust | 601 West 6th Street Houston, TX 77007 |
| Aztec / Shaffer, LLC | 2630 Fifth Avenue Irondale, LLC | 2630 Fifth Avenue Irondale, AL 35210 |
| Aztec / Shaffer, LLC | 3316 West 11th Street, LLC | 3316 West 11th Street, Houston, TX 77007 |
| Aztec / Shaffer, LLC | Heights Landowners, LLC | 707 W. 6th Street, Houston, Harris County, Texas |

# **SCHEDULE 9**

LIST OF UNIFORM COMMERCIAL CODE FILING JURISDICTIONS

- Aztec / Shaffer, LLC – Texas Secretary of State
- ASAIG, LLC – Texas Secretary of State

# **SCHEDULE 10**

ACQUISITIONS

None.

## **SCHEDULE 11**

OTHER CURRENT LOCATIONS

- 601 W. 6th Street, Houston, TX 77007
- 3316 W. 11th Street, Houston, TX 77007
- 2630 Fifth Avenue, Irondale, AL 35210
- 707 W. 6th Street, Houston, Harris County, Texas

## EXHIBIT A
## FIRST LIEN COPYRIGHT SECURITY AGREEMENT

This FIRST LIEN COPYRIGHT SECURITY AGREEMENT (this "Copyright Security Agreement") is made as of this [____] day of [_____], [____], between [_____] (the "Grantor"), and CORTLAND CAPITAL MARKET SERVICES LLC, in its capacity as collateral agent pursuant to the Credit Agreement referred to below (together with its successors and assigns, the "Collateral Agent").

W I T N E S S E T H:

WHEREAS, pursuant to that certain First Lien Credit Agreement, dated as of February 13, 2019 (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), by and among Aztec / Shaffer, LLC, a Texas limited liability company (the "Borrower"), the other Persons party thereto from time to time as Guarantors, the financial institutions party thereto from time to time as Lenders, Cortland Capital Market Services LLC, as the Term Loan Agent and Collateral Agent, and Texas Capital Bank, National Association, as the Revolving Agent, the Lenders are willing to make certain financial accommodations available to the Borrower from time to time pursuant to the terms and conditions thereof; and

WHEREAS, as a condition precedent to the making of such financial accommodations, Grantor is required to execute and deliver to the Collateral Agent that certain First Lien Security Agreement, dated as of February 13, 2019 (including all annexes, exhibits or schedules thereto, as from time to time amended, restated, supplemented or otherwise modified, the "Security Agreement") by and among the Borrower, the other grantors party thereto and the Collateral Agent; and

WHEREAS, pursuant to the Security Agreement, the Grantor is required to execute and deliver to the Collateral Agent this Copyright Security Agreement;

NOW, THEREFORE, in consideration of the premises and mutual covenants herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Grantor hereby agrees as follows:

1.    DEFINED TERMS.  All capitalized terms used but not otherwise defined herein have the meanings given to them in the Security Agreement or, if not defined therein, in the Credit Agreement.

2.    GRANT OF SECURITY INTEREST IN COPYRIGHT COLLATERAL.   The Grantor hereby grants, mortgages, pledges and hypothecates to the Collateral Agent, for the benefit of the Secured Parties, a continuing security interest in and Lien on all of the Grantor's right, title and interest in and to the following, whether presently now owned or hereafter acquired or arising and wherever located (collectively, the "Copyright Collateral"):

(a) (i) any and all of the Grantor's Copyrights listed or required to be listed on Schedule I hereto, (ii) all reissues, continuations, extensions or renewals thereof, (iii) all income, royalties, damages and payment under all licenses entered into in connection therewith and

damages and payments for past or future infringements or other violations thereof, (iv) the right to sue for past, present and future infringements or other violations thereof and (v) all of each Grantor's rights corresponding to the foregoing throughout the world;

(b) any and all agreements, licenses and covenants providing for the granting of any exclusive right to Grantor in or to any registered Copyright, including each agreement listed or required to be listed on <u>Schedule I</u> hereto, and the right to sue or otherwise recover for past, present and future infringement or other violation or impairment thereof.

3.    <u>SECURITY FOR OBLIGATIONS</u>.  This Copyright Security Agreement and the Security Interest created hereby secures the payment and performance of all the Secured Obligations, whether now existing or arising hereafter.  Without limiting the generality of the foregoing, this Copyright Security Agreement secures the payment of all amounts which constitute part of the Secured Obligations and would be owed by the Grantors, or any of them, to the Collateral Agent, whether or not they are unenforceable or not allowable due to the existence of an Insolvency Proceeding involving any Grantor.

4.    <u>SECURITY AGREEMENT</u>.  The security interests granted pursuant to this Copyright Security Agreement are granted in conjunction with the security interests granted to the Collateral Agent pursuant to the Security Agreement.  The Grantor hereby acknowledges and affirms that the rights and remedies of the Collateral Agent with respect to the security interest in the Copyright Collateral made and granted hereby are more fully set forth in the Security Agreement, the terms and provisions of which are incorporated by reference herein as if fully set forth herein.

5.    <u>COUNTERPARTS</u>.  This Copyright Security Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all such separate counterparts shall together constitute but one and the same agreement.  In proving this Copyright Security Agreement in any judicial proceedings, it shall not be necessary to produce or account for more than one such counterpart signed by the party against whom such enforcement is sought.  Any signatures hereto delivered by Electronic Transmission shall be deemed an original signature hereto.

6.    <u>GOVERNING LAW</u>.  All matters arising out of, in connection with or relating to this Copyright Security Agreement, including, without limitation, their validity, interpretation, construction, performance and enforcement (including, without limitation, any claims sounding in contract or tort law arising out of the subject matter hereof or thereof and any determinations with respect to post-judgment interest), shall be construed in accordance with and governed by the laws of the State of New York.

7.    <u>CONSTRUCTION</u>.  Unless the context of this Copyright Security Agreement or any other Loan Document clearly requires otherwise, references to the plural include the singular, references to the singular include the plural, the terms "includes" and "including" are not limiting, and the term "or" has, except where otherwise indicated, the inclusive meaning represented by the phrase "and/or."  The words "hereof," "herein," "hereby," "hereunder," and similar terms in this Copyright Security Agreement or any other Loan Document refer to this Copyright Security Agreement or such other Loan Document, as the case may be, as a whole and not to any particular

2

provision of this Copyright Security Agreement or such other Loan Document, as the case may be. Section, subsection, clause, schedule, and exhibit references herein are to this Copyright Security Agreement unless otherwise specified. Any reference in this Copyright Security Agreement or in any other Loan Document to any agreement, instrument, or document shall include all alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements, thereto and thereof, as applicable (subject to any restrictions on such alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements set forth herein). Any reference herein to any Person shall be construed to include such Person's successors and assigns. Any requirement of a writing contained herein or in any other Loan Document shall be satisfied by the transmission of a Record or any other Electronic Transmission and any Record or any other Electronic Transmission so transmitted shall constitute a representation and warranty as to the accuracy and completeness of the information contained therein.

[remainder of page left blank intentionally]

3

IN WITNESS WHEREOF, the Grantor has caused this Copyright Security Agreement to be executed and delivered by its duly authorized officer as of the date first set forth above.


**GRANTOR:**                           [_____]

                                       By:_____
                                            Name:
                                            Title:



**ACCEPTED AND ACKNOWLEDGED**    **CORTLAND CAPITAL MARKET**
**BY**:                          **SERVICES LLC**, as the Collateral Agent

                                       By:_____
                                            Name:
                                            Title:


SIGNATURE PAGE TO FIRST LIEN COPYRIGHT SECURITY AGREEMENT

<u>**SCHEDULE I**</u>
TO
<u>**FIRST LIEN COPYRIGHT SECURITY AGREEMENT**</u>

<u>**COPYRIGHT REGISTRATIONS**</u>

| Grantor | Country | Copyright | Registration No. | Registration Date |
|---------|---------|-----------|------------------|-------------------|
|         |         |           |                  |                   |
|         |         |           |                  |                   |
|         |         |           |                  |                   |
|         |         |           |                  |                   |
|         |         |           |                  |                   |
|         |         |           |                  |                   |
|         |         |           |                  |                   |
|         |         |           |                  |                   |

<u>**EXHIBIT B**</u>

<u>**FIRST LIEN PATENT SECURITY AGREEMENT**</u>

This FIRST LIEN PATENT SECURITY AGREEMENT (this "<u>Patent Security Agreement</u>") is made as of this [___] day of [____], [_____], between [_____] (the "<u>Grantor</u>"), and CORTLAND CAPITAL MARKET SERVICES LLC, in its capacity as collateral agent pursuant to the Credit Agreement referred to below (together with its successors and assigns, the "<u>Collateral Agent</u>").

<u>W I T N E S S E T H</u>:

WHEREAS, pursuant to that certain First Lien Credit Agreement, dated as of February 13, 2019 (as amended, restated, supplemented or otherwise modified from time to time, the "<u>Credit Agreement</u>"), by and among Aztec / Shaffer, LLC, a Texas limited liability company (the "<u>Borrower</u>"), the other Persons party thereto from time to time as Guarantors, the financial institutions party thereto from time to time as Lenders, Cortland Capital Market Services LLC, as the Term Loan Agent and the Collateral Agent, and Texas Capital Bank, National Association, as the Revolving Agent, the Lenders are willing to make certain financial accommodations available to the Borrower from time to time pursuant to the terms and conditions thereof; and

WHEREAS, as a condition precedent to the making of such financial accommodations, the Grantor is required to execute and deliver to the Collateral Agent that certain First Lien Security Agreement, dated as of February 13, 2019 (including all annexes, exhibits or schedules thereto, as from time to time amended, restated, supplemented or otherwise modified, the "<u>Security Agreement</u>") by and among the Borrower, the other grantors party thereto and the Collateral Agent; and

WHEREAS, pursuant to the Security Agreement, the Grantor is required to execute and deliver to the Collateral Agent this Patent Security Agreement;

NOW, THEREFORE, in consideration of the premises and mutual covenants herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Grantor hereby agrees as follows:

1.    <u>DEFINED TERMS</u>.  All capitalized terms used but not otherwise defined herein have the meanings given to them in the Security Agreement or, if not defined therein, in the Credit Agreement.

2.    <u>GRANT OF SECURITY INTEREST IN PATENT COLLATERAL</u>.  The Grantor hereby grants, mortgages, pledges and hypothecates to the Collateral Agent, for the benefit of the Secured Parties, a continuing security interest in and Lien on all of the Grantor's right, title and interest in and to the following, whether now owned or hereafter acquired or arising and wherever located (collectively, the "<u>Patent Collateral</u>"):

(i) any and all of the Grantor's Patents listed or required to be listed on <u>Schedule I</u> hereto, (ii) all renewals thereof, (iii) all income, royalties, damages and payments now and

hereafter due or payable under and with respect thereto, including payments under all licenses entered into in connection therewith and damages and payments for past or future infringements or other violations thereof, (iv) the right to sue for past, present and future infringements thereof, and (v) all of each Grantor's rights corresponding to the foregoing throughout the world.

3.  SECURITY FOR OBLIGATIONS.  This Patent Security Agreement and the Security Interest created hereby secures the payment and performance of all the Secured Obligations, whether now existing or arising hereafter.  Without limiting the generality of the foregoing, this Patent Security Agreement secures the payment of all amounts which constitute part of the Secured Obligations and would be owed by the Grantors, or any of them, to the Collateral Agent, whether or not they are unenforceable or not allowable due to the existence of an Insolvency Proceeding involving any Grantor.

4.  SECURITY AGREEMENT.  The security interests granted pursuant to this Patent Security Agreement are granted in conjunction with the security interests granted to the Collateral Agent pursuant to the Security Agreement.  The Grantor hereby acknowledges and affirms that the rights and remedies of the Collateral Agent with respect to the security interest in the Patent Collateral made and granted hereby are more fully set forth in the Security Agreement, the terms and provisions of which are incorporated by reference herein as if fully set forth herein.

5.  COUNTERPARTS.  This Patent Security Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all such separate counterparts shall together constitute but one and the same agreement.  In proving this Patent Security Agreement in any judicial proceedings, it shall not be necessary to produce or account for more than one such counterpart signed by the party against whom such enforcement is sought.  Any signatures hereto delivered by Electronic Transmission shall be deemed an original signature hereto.

6.  GOVERNING LAW.  All matters arising out of, in connection with or relating to this Patent Security Agreement, including, without limitation, their validity, interpretation, construction, performance and enforcement (including, without limitation, any claims sounding in contract or tort law arising out of the subject matter hereof or thereof and any determinations with respect to post-judgment interest), shall be construed in accordance with and governed by the laws of the State of New York.

7.  CONSTRUCTION.  Unless the context of this Patent Security Agreement or any other Loan Document clearly requires otherwise, references to the plural include the singular, references to the singular include the plural, the terms "includes" and  "including" are not limiting, and the term "or" has, except where otherwise indicated, the inclusive meaning represented by the phrase "and/or."  The words "hereof," "herein," "hereby," "hereunder," and similar terms in this Patent Security Agreement or any other Loan Document refer to this Patent Security Agreement or such other Loan Document, as the case may be, as a whole and not to any particular provision of this Patent Security Agreement or such other Loan Document, as the case may be.  Section, subsection, clause, schedule, and exhibit references herein are to this Patent Security Agreement unless otherwise specified.  Any reference in this Patent Security Agreement or in any other Loan Document to any agreement, instrument, or document shall include all alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, joinders, and

2

supplements, thereto and thereof, as applicable (subject to any restrictions on such alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements set forth herein). Any reference herein to any Person shall be construed to include such Person's successors and assigns. Any requirement of a writing contained herein or in any other Loan Document shall be satisfied by the transmission of a Record or any other Electronic Transmission and any Record or any other Electronic Transmission so transmitted shall constitute a representation and warranty as to the accuracy and completeness of the information contained therein.

[remainder of page left blank intentionally]

3

IN WITNESS WHEREOF, the Grantor has caused this Patent Security Agreement to be executed and delivered by its duly authorized officer as of the date first set forth above.

**GRANTOR:**                    [_____]

By:_____
     Name:
     Title:

**ACCEPTED AND ACKNOWLEDGED**        **CORTLAND CAPITAL MARKET**
**BY**:                                **SERVICES LLC**, as the Collateral Agent

By:_____
     Name:
     Title:

## SCHEDULE I
### to
### FIRST LIEN PATENT SECURITY AGREEMENT

#### PATENT REGISTRATIONS

| Grantor | Country | Patent | Registration No. | Registration Date |
|---------|---------|--------|------------------|-------------------|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

US 6078468v.4

**EXHIBIT C**

**PLEDGED EQUITY ADDENDUM**


      This Pledged Equity Addendum, dated as of [_____] [__], [_____], is delivered pursuant to Section 6 of the Security Agreement referred to below.  The undersigned hereby agrees that this Pledged Equity Addendum may be attached to that certain First Lien Security Agreement, dated as of February 13, 2019 (as amended, restated, supplemented or otherwise modified from time to time, the "Security Agreement"), made by the undersigned, together with the other Grantors named therein, in favor of CORTLAND CAPITAL MARKET SERVICES LLC as the Collateral Agent. Initially capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Security Agreement or, if not defined therein, the Credit Agreement (as defined in the Security Agreement).  The undersigned hereby agrees that the additional interests listed on this Pledged Equity Addendum as set forth below shall be and become part of the Pledged Equity pledged by the undersigned to the Collateral Agent in the Security Agreement and any pledged company set forth on this Pledged Equity Addendum as set forth below shall be and become a "Pledged Company" under the Security Agreement, each with the same force and effect as if originally named therein.

      The undersigned hereby certifies that the representations and warranties set forth in Section 5 of the Security Agreement of the undersigned are true and correct as to the Pledged Equity listed herein on and as of the date hereof.


[_____]


By: _____
    Name:
    Title:


SIGNATURE PAGE TO PLEDGED EQUITY ADDENDUM

| Name of Pledgor | Name of Pledged Company | Number of Shares/Units | Class of Interests | Percentage of Class Owned | Certificate Nos. |
|---|---|---|---|---|---|
|  |  |  |  |  |  |
|  |  |  |  |  |  |

<u>**EXHIBIT D**</u>

<u>**FIRST LIEN TRADEMARK SECURITY AGREEMENT**</u>

This FIRST LIEN TRADEMARK SECURITY AGREEMENT (this "<u>Trademark Security Agreement</u>") is made as of this [___] day of [____], [____], between [_____] (the "<u>Grantor</u>"), and CORTLAND CAPITAL MARKET SERVICES LLC, in its capacity as collateral agent pursuant to the Credit Agreement referred to below (together with its successors and assigns, the "<u>Collateral Agent</u>").

W I T N E S S E T H :

WHEREAS, pursuant to that certain First Lien Credit Agreement, dated as of February 13, 2019 (as amended, restated, supplemented or otherwise modified from time to time, the "<u>Credit Agreement</u>"), by and among Aztec / Shaffer, LLC, a Texas limited liability company (the "<u>Borrower</u>"), the other Persons party thereto from time to time as Guarantors, the financial institutions party thereto from time to time as Lenders, Cortland Capital Market Services LLC, as the Term Loan Agent and the Collateral Agent, and Texas Capital Bank, National Association, as the Revolving Agent, the Lenders are willing to make certain financial accommodations available to the Borrower from time to time pursuant to the terms and conditions thereof; and

WHEREAS, as a condition precedent to the making of such financial accommodations, the Grantor is required to execute and deliver to the Collateral Agent that certain First Lien Security Agreement, dated as of February 13, 2019 (including all annexes, exhibits or schedules thereto, as from time to time amended, restated, supplemented or otherwise modified, the "<u>Security Agreement</u>") by and among the Borrower, the other grantors party thereto and the Collateral Agent; and

WHEREAS, pursuant to the Security Agreement, the Grantor is required to execute and deliver to the Collateral Agent this Trademark Security Agreement;

NOW, THEREFORE, in consideration of the premises and mutual covenants herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Grantor hereby agrees as follows:

1.      <u>DEFINED TERMS</u>.  All capitalized terms used but not otherwise defined herein have the meanings given to them in the Security Agreement or, if not defined therein, in the Credit Agreement.

2.      <u>GRANT OF SECURITY INTEREST IN TRADEMARK COLLATERAL</u>.  The Grantor hereby grants, mortgages, pledges and hypothecates to the Collateral Agent, for the benefit of the Secured Parties, a continuing security interest in all of Grantor's right, title and interest in and to the following, whether now owned or hereafter acquired or arising and wherever located (collectively, the "<u>Trademark Collateral</u>"):

(i) any and all of the Grantor's Trademarks listed on <u>Schedule I</u> hereto; (ii) all renewals thereof, (iii) all income, royalties, damages and payments now and hereafter due or payable under and with respect thereto, including payments under all licenses entered into in

connection therewith and damages and payments for past or future infringements, dilutions or other violations thereof, (iv) the right to sue for past, present and future infringements, dilution or other violations thereof, (v) the goodwill of each Grantor's business symbolized by the foregoing and connected therewith and (vi) all of each Grantor's rights corresponding to the foregoing throughout the world; provided, however, that the Trademark Collateral shall not include any Excluded Collateral.

3. <u>SECURITY FOR OBLIGATIONS</u>.  This Trademark Security Agreement and the Security Interest created hereby secures the payment and performance of all the Secured Obligations, whether now existing or arising hereafter.  Without limiting the generality of the foregoing, this Trademark Security Agreement secures the payment of all amounts which constitute part of the Secured Obligations and would be owed by the Grantors, or any of them, to the Collateral Agent, whether or not they are unenforceable or not allowable due to the existence of an Insolvency Proceeding involving any Grantor.

4. <u>SECURITY AGREEMENT</u>.  The security interests granted pursuant to this Trademark Security Agreement are granted in conjunction with the security interests granted to the Collateral Agent pursuant to the Security Agreement.  The Grantor hereby acknowledges and affirms that the rights and remedies of the Collateral Agent with respect to the security interest in the Trademark Collateral made and granted hereby are more fully set forth in the Security Agreement, the terms and provisions of which are incorporated by reference herein as if fully set forth herein.

5. <u>COUNTERPARTS</u>.  This Trademark Security Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all such separate counterparts shall together constitute but one and the same agreement.  In proving this Trademark Security Agreement in any judicial proceedings, it shall not be necessary to produce or account for more than one such counterpart signed by the party against whom such enforcement is sought.  Any signatures hereto delivered by Electronic Transmission shall be deemed an original signature hereto.

6. <u>GOVERNING LAW</u>.  All matters arising out of, in connection with or relating to this Trademark Security Agreement, including, without limitation, their validity, interpretation, construction, performance and enforcement (including, without limitation, any claims sounding in contract or tort law arising out of the subject matter hereof or thereof and any determinations with respect to post-judgment interest), shall be construed in accordance with and governed by the laws of the State of New York.

7. <u>CONSTRUCTION</u>.  Unless the context of this Trademark Security Agreement or any other Loan Document clearly requires otherwise, references to the plural include the singular, references to the singular include the plural, the terms "includes" and "including" are not limiting, and the term "or" has, except where otherwise indicated, the inclusive meaning represented by the phrase "and/or."  The words "hereof," "herein," "hereby," "hereunder," and similar terms in this Trademark Security Agreement or any other Loan Document refer to this Trademark Security Agreement or such other Loan Document, as the case may be, as a whole and not to any particular provision of this Trademark Security Agreement or such other Loan Document, as the case may be.  Section, subsection, clause, schedule, and exhibit references herein are to this Agreement

2

unless otherwise specified.  Any reference in this Trademark Security Agreement or in any other Loan Document to any agreement, instrument, or document shall include all alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements, thereto and thereof, as applicable (subject to any restrictions on such alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements set forth herein).  Any reference herein to any Person shall be construed to include such Person's successors and assigns.  Any requirement of a writing contained herein or in any other Loan Document shall be satisfied by the transmission of a Record or any other Electronic Transmission and any Record or any other Electronic Transmission so transmitted shall constitute a representation and warranty as to the accuracy and completeness of the information contained therein.

[remainder of page left blank intentionally]

3

IN WITNESS WHEREOF, the Grantor has caused this Trademark Security Agreement to be executed and delivered by its duly authorized officer as of the date first set forth above.

**GRANTOR:**

[_____]

By:_____
   Name:
   Title:

**ACCEPTED AND ACKNOWLEDGED BY**:

**CORTLAND CAPITAL MARKET SERVICES LLC**, as the Collateral Agent

By:_____
   Name:
   Title:

SIGNATURE PAGE TO TRADEMARK SECURITY AGREEMENT

## SCHEDULE I
to
## FIRST LIEN TRADEMARK SECURITY AGREEMENT

### Trademark Registrations/Applications

| Grantor | Mark | Application/ Registration No. | App/Reg Date |
|---------|------|-------------------------------|--------------|
|         |      |                               |              |
|         |      |                               |              |
|         |      |                               |              |
|         |      |                               |              |
|         |      |                               |              |
|         |      |                               |              |
|         |      |                               |              |
|         |      |                               |              |

US 6078468v.4

ANNEX 1 TO SECURITY AGREEMENT
FORM OF SUPPLEMENT

Supplement No. [__] (this "Supplement") dated as of [_____] [__], [____], to the First Lien Security Agreement, dated as of February 13, 2019 (as amended, restated, supplemented or otherwise modified from time to time, the "Security Agreement"), by each of the parties listed on the signature pages thereto and those additional entities that thereafter become parties thereto (collectively, jointly and severally, the "Grantors" and each individually, a "Grantor") in favor of CORTLAND CAPITAL MARKET SERVICES LLC, in its capacity as collateral agent pursuant to the Credit Agreement referred to below (together with its successors and assigns, the "Collateral Agent").

W I T N E S S E T H :

WHEREAS, pursuant to that certain First Lien Credit Agreement, dated as of February 13, 2019 (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), by and among Aztec / Shaffer, LLC, a Texas limited liability company (the "Borrower"), the other Persons party thereto from time to time as Guarantors, the financial institutions party thereto from time to time as Lenders, Cortland Capital Market Services LLC, as the Term Loan Agent and Collateral Agent, and Texas Capital Bank, National Association, as the Revolving Agent, the Lenders are willing to make certain financial accommodations available to the Borrower from time to time pursuant to the terms and conditions thereof.

WHEREAS, capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Security Agreement or, if not defined therein, in the Credit Agreement.

WHEREAS, the Grantors have entered into the Security Agreement in order to induce the Lenders to make certain financial accommodations to the Borrower.

WHEREAS, pursuant to Section 6.20 of the Credit Agreement, new direct or indirect Subsidiaries of the Borrower must execute and deliver to the Collateral Agent certain Loan Documents, including the Security Agreement, and the execution of the Security Agreement by the undersigned new Grantor or Grantors (each, a "New Grantor" and collectively, the "New Grantors") may be accomplished by the execution of this Supplement in favor of the Collateral Agent.

NOW, THEREFORE, for and in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each New Grantor hereby agrees as follows:

1.      In accordance with Section 26 of the Security Agreement, each New Grantor, by its signature below, becomes a "Grantor" under the Security Agreement with the same force and effect as if originally named therein as a "Grantor" and each New Grantor hereby (a) agrees to all of the terms and provisions of the Security Agreement applicable to it as a "Grantor" thereunder, (b) unconditionally grants, collaterally assigns, mortgages, pledges and hypothecates to the Collateral Agent, for the benefit of the Secured Parties, a continuing security interest in and Lien

on all of such Grantor's right, title and interest in and to the Collateral, whether now owned or hereafter acquired or arising and wherever located and (c) represents and warrants that the representations and warranties made by it as a "Grantor" thereunder are true and correct on and as of the date hereof (except to the extent that any such representation or warranty relates to a specific date in which case such representation or warranty shall be true and correct in all respects as of such earlier date). In furtherance of the foregoing, each New Grantor, as security for the payment and performance in full of the Secured Obligations, does hereby grant, collaterally assign, and pledge to the Collateral Agent, for the benefit of the Secured Parties, a security interest in and security title to all Collateral of such New Grantor to secure the full and prompt payment of the Secured Obligations, including any interest thereon. Schedule 1, "Trade Names; Organizational Identification Numbers; Chief Executive Offices", Schedule 2, "Commercial Tort Claims", Schedule 3, "Copyrights", Schedule 4, "Intellectual Property Licenses", Schedule 5, "Patents", Schedule 6, "Pledged Companies", Schedule 7, "Trademarks", Schedule 8, "Real Property", Schedule 9, "List of Uniform Commercial Code Filing Jurisdictions", Schedule 10, "Acquisitions" and Schedule 11, "Other Current Locations" attached hereto supplement Schedule 1, Schedule 2, Schedule 3, Schedule 4, Schedule 5, Schedule 6, Schedule 7, Schedule 8, Schedule 9, Schedule 10 and Schedule 11 respectively, to the Security Agreement and shall be deemed a part thereof for all purposes of the Security Agreement. Each reference to a "Grantor" in the Security Agreement shall be deemed to include each New Grantor. The Security Agreement is incorporated herein by reference.

2.      Each New Grantor represents and warrants to the Collateral Agent that this Supplement has been duly executed and delivered by such New Grantor and constitutes its legal, valid and binding obligation, enforceable against it in accordance with its terms, except as enforceability thereof may be limited by bankruptcy, insolvency, reorganization, fraudulent transfer, moratorium or other similar laws affecting creditors' rights generally and general principles of equity (regardless of whether such enforceability is considered in a proceeding at law or in equity).

3.      This Supplement may be executed in multiple counterparts, each of which shall be deemed to be an original, but all such separate counterparts shall together constitute but one and the same agreement. In proving this Supplement in any judicial proceedings, it shall not be necessary to produce or account for more than one such counterpart signed by the party against whom such enforcement is sought. Any signatures hereto delivered by Electronic Transmission shall be deemed an original signature hereto.

4.      Except as expressly supplemented hereby, the Security Agreement shall remain in full force and effect.

5.      All matters arising out of, in connection with or relating to this Supplement, including, without limitation, their validity, interpretation, construction, performance and enforcement (including, without limitation, any claims sounding in contract or tort law arising out of the subject matter hereof or thereof and any determinations with respect to post-judgment interest), shall be construed in accordance with and governed by the laws of the State of New York.

US 6078468v.4

[remainder of page left blank intentionally]

US 6078468v.4

IN WITNESS WHEREOF, each New Grantor and the Collateral Agent have duly executed this Supplement to the Security Agreement as of the day and year first above written.

**NEW GRANTORS:**                    **[Name of New Grantor]**


By:_____
    Name:
    Title:

**[Name of New Grantor]**


By:_____
    Name:
    Title:

**COLLATERAL AGENT:**               **CORTLAND CAPITAL MARKET SERVICES LLC**


By:_____
    Name:
    Title: